La Jueza Asociada Señora Fiol Matta
emitió la opinión del Tribunal.
El poder de la voluntad humana no se agota en el ejercicio de la actividad final, sino que comprende también la omisión de ella. H. Welzel, Derecho Penal Alemán, (J. Bustos Ramírez y S. Yañez Pérez, trads.), lima ed., Santiago de Chile, Ed. Jurídica de Chile, 1997, pág. 237.
Debemos precisar los contornos de dos figuras jurídicas incorporadas a nuestro ordenamiento en el nuevo Código *266 Penal de Puerto Rico aprobado en el 2004. Nos referimos a la figura del cooperador y al concepto de comisión por omisión. Los hechos de este caso nos requieren determinar específicamente si se puede procesar a una persona como cooperador del delito de asesinato en primer grado cuando su infracción penal estuvo fundamentada en la omisión impropia de un deber de garante y precisar, a la vez, el grado de conocimiento del delito que debe tener ese cooperador para poder ser encausado.
La necesidad de interpretar y otorgar contenido a estos conceptos penales se hizo patente cuando el Sr. Carlos Sustache Sustache presentó ante este Tribunal un recurso de certiorari para cuestionar la sentencia emitida por el Tribunal de Apelaciones el 29 de noviembre del 2007. En ésta, el foro apelativo encontró causa probable para arresto contra el señor Sustache Sustache por los delitos de agresión y asesinato en primer grado, ambos en la modalidad de cooperador y por el delito de encubrimiento, en la categoría de autor.
Al evaluar los hechos de este caso, el Tribunal de Apelaciones consideró toda la prueba documental incluida en el expediente judicial. En específico, el tribunal utilizó la Moción de Reconsideración a la Determinación de No Causa para Arresto en Alzada, que el Ministerio Público sometió al Tribunal de Primera Instancia el 4 de septiembre del 2007 como resumen de la prueba testifical presentada en la vista de causa probable para arresto en alzada. La representación legal del señor Sustache Sustache no controvirtió este resumen en su contestación a la petición del Ministerio Público, titulada Moción Urgente en Oposición a la Segunda Solicitud de Reconsideración a la Determinación de No Causa para Arresto en Alzada, sometida el 5 de septiembre del 2007. Cabe señalar que aunque denegó la solicitud de la Fiscalía, tampoco el juez de instancia cuestionó la síntesis de los testimonios incluida en la moción de reconsideración.
*267 A continuación se exponen los hechos pertinentes a la controversia que surgen de los documentos que se incluyen en el legajo.
I
El 11 de agosto de 2007, en el sector Punta Santiago del pueblo de Humacao, se estaba celebrando una fiesta de quinceañero. Como parte de la actividad, llegaron a la residencia de la quinceañera un Club de vehículos marca Mitsubishi, modelo Lancer, que iban a desempeñarse como su escolta. Estos automóviles se estacionaron en el lado derecho de la carretera frente a la casa de la homenajeada. Posteriormente, acudieron al lugar el “Club de Motoras Scooters de Punta Santiago”, que también iban a ser parte de la escolta de la quinceañera. El grupo de motociclistas estaba compuesto por 11 personas que utilizaban como uniforme y distintivo del Club una camisa de color amarillo.
Al llegar al lugar, los miembros del Club colocaron sus motoras justo al frente de la escolta de vehículos, ocupando de esta forma el carril derecho de la carretera. El Sr. Miguel Cáceres Cruz y otro miembro del Club de motoras se ubicaron en lados opuestos del carril izquierdo de la carretera para dirigir el tránsito y evitar que se creara una congestión vehicular.
Cuando el señor Cáceres Cruz dirigía el tránsito, llegó al lugar una patrulla de la policía con tres agentes del or-den público; éstos eran la oficial Zulma Díaz De León, el oficial Sustache Sustache y el oficial Javier Pagán Cruz. El señor Cáceres Cruz les hizo señales a los agentes de la Policía para que continuaran su marcha. Ante este acto, los agentes detuvieron su vehículo oficial frente al señor Cáceres Cruz, se bajaron de la patrulla y le cuestionaron su autoridad para dirigir el tránsito. Además, los funcionarios del orden público le ordenaron al señor Cáceres Cruz que se sacaran las motoras porque obstruían el tránsito.
*268 Los motociclistas procedieron a mover las motoras a la acera y los policías se montaron en la patrulla e iniciaron nuevamente su marcha. Sin embargo, como alegadamente se desarrolló un intercambio de palabras entre el agente Pagán Cruz y el señor Cáceres Cruz, los tres policías se bajaron otra vez del vehículo oficial. En ese momento, la agente Díaz De León sacó sus esposas e intentó arrestar al señor Cáceres Cruz. Este, para impedir que le arrestaran, comenzó a caminar hacia atrás y le solicitó a los agentes que no lo tocaran.
El policía Pagán Cruz también intentó poner bajo custodia al señor Cáceres Cruz, pero éste continuó caminando en retroceso. En ese momento, el agente Pagán Cruz le propinó un puño en la cabeza al señor Cáceres Cruz quien cayó sentado en el suelo. El policía Pagán Cruz se ubicó encima del señor Cáceres Cruz y lo continuó golpeando con sus puños. El cuerpo del señor Cáceres Cruz quedó entre las piernas del oficial.
Ni la agente Díaz De León ni el agente Sustache Sustache evitaron que el policía Pagán Cruz siguiera golpeando al señor Cáceres Cruz. Por el contrario, cuando el Sr. Cristino “Tino” Cruz intentó ayudar al señor Cáceres Cruz para impedir que continuara la golpiza, el policía Sustache Sustache no le permitió que se acercara. De igual forma, cuando el Sr. Francisco Toyens Quiñones trató de sacar al señor “Tino” Cruz del lugar de la controversia, el agente Sustache Sustache le ordenó que se hiciera a un lado y fue él mismo quien lo sacó.
Por su parte, el señor Cáceres Cruz trató de levantarse del piso agarrándose de la correa de la baqueta que el agente Pagán Cruz tenía en el muslo de su pierna derecha. Esta baqueta contenía un arma de fuego. Al mismo tiempo, el policía Pagán Cruz sujetó su baqueta y en el forcejeo con el señor Cáceres Cruz, para evitar que éste se levantara, se disparó el revólver.
Ante el disparo, el agente Sustache Sustache empujó al *269 señor Toyens Quiñones y salió corriendo hacia la patrulla. El señor Cáceres Cruz, luego de la detonación, quedó boca arriba acostado en el piso. El oficial Pagán Cruz recibió una herida de bala en el muslo de su pierna izquierda y al sentir que su pierna izquierda flaqueaba, se recostó de un zafacón y de un poste del tendido eléctrico. Luego, el policía Pagán Cruz quitó el velero de la baqueta, y al sacar la pistola cayó al suelo el casquillo de la bala que se había disparado. Entonces, el agente Pagán Cruz “chamboneó” —es decir, cargó su arma de fuego— y le disparó varias veces al señor Cáceres Cruz. Al recibir los impactos de bala, el cuerpo del señor Cáceres Cruz cayó hacia el lado derecho. Finalmente, el oficial Pagán Cruz se bajó hacia el cuerpo del señor Cáceres Cruz, buscó su cabeza y le disparó. En ese momento, el agente Pagán Cruz metió su revólver nuevamente en su baqueta y se recostó de un vehículo.
Durante toda esta situación, ni la agente Díaz De León ni el agente Sustache Sustache intervinieron. Tampoco proveyeron ayuda al señor Cáceres Cruz. Ambos oficiales del orden público asistieron al agente Pagán Cruz, montándolo en la patrulla y llevándolo al Hospital Ryder en el pueblo de Humacao. Ninguno de ellos se acercó al cuerpo del señor Cáceres Cruz para revisar si aún se encontraba con vida. Por el contrario, tanto la agente Díaz De León como el agente Sustache Sustache optaron por dejar en el piso al señor Cáceres Cruz sin proveerle ni conseguirle ayuda, a pesar de que cuando se dirigían al hospital pasaron por el lado del cuerpo del señor Cáceres Cruz.
La opción de los oficiales del orden público de no socorrer al señor Cáceres Cruz y dejar su cuerpo en el suelo, les impidió percatarse de que éste aún estaba vivo. El Sr. Fermín Torres López, presidente del “Club de Motoras Scooter de Punta Santiago”, testificó que al acercarse al cuerpo del señor Cáceres Cruz se percató de que éste todavía respiraba. Por eso les solicitó a las personas que estaban *270 presentes que llamaran al sistema de emergencias médicas 911. Cuando el teniente Rodríguez González llegó a Punta Santiago también se percató de que el señor Cáceres Cruz se encontraba con vida y ordenó a los agentes que lo acompañaban que lo montaran en el carro oficial y lo llevaran al Hospital Ryder. Una vez en el hospital, se certificó la muerte del señor Cáceres Cruz.
El Ledo. Jaime Perea Mercado, Fiscal Auxiliar en la Fiscalía de Humacao, tuvo la responsabilidad de realizar la investigación de este caso. La información de lo acontecido se la comunicó el teniente Velázquez, director de Homicidios del CIC en Humacao. Específicamente, el teniente Velázquez le informó al fiscal Perea Mercado que una persona le quitó el arma a un policía, lo hirió y que el oficial recuperó el arma y le disparó varias veces al civil.
Ante esta información, el fiscal Perea Mercado se dirigió a Punta Santiago a revisar la escena del crimen. Luego, entrevistó individualmente a los agentes Díaz De León y Sustache Sustache. Al momento de la entrevista, el fiscal Perea Mercado no consideraba como sospechosos a ninguno de los tres agentes de la policía.
Durante la entrevista, el oficial Sustache Sustache le expresó al fiscal Perea Mercado que todo el incidente se había suscitado muy rápido y que en todo momento le estuvo dando la espalda al agente Pagán Cruz porque había muchas personas. También indicó que se encargó de mantener alejados a los civiles y sacó su gas pimienta, pero no se atrevió utilizarlo porque le hubiera hecho daño a su compañero Pagán Cruz. Todo el incidente entre el señor Cáceres Cruz y los agentes de la Policía fue grabado por una persona en su celular. Este video fue suministrado a la prensa y transmitido por televisión. Cuando el fiscal Perea Mercado observó el video se percató de que había una inconsistencia entre éste y la versión de los hechos que le habían ofrecido los oficiales Díaz De León y Sustache Sustache. En lo que se refiere a este último, las inconsis *271 tencias fueron las siguientes: (1) el agente Sustache Sustache en ningún momento sacó el gas pimienta y (2) no había mucha gente en el lugar de los hechos.
A causa de esta nueva información, el 20 de agosto de 2007 el Estado presentó unas denuncias separadas contra el agente Pagán Cruz, por el delito de asesinato en primer grado, y contra los agentes Sustache Sustache y Díaz De León por el delito de asesinato en primer grado, en la modalidad de cooperador. El Tribunal de Primera Instancia no encontró causa probable para arresto contra el oficial Sustache Sustache. Por esto, el 22 de agosto de 2007 el Ministerio Público solicitó una vista de causa probable para arresto en alzada. La vista se celebró el 28 de agosto de 2007 y el foro de instancia determinó nuevamente que no existía causa para arresto. Ante tal dictamen y de forma verbal en la vista, el Ministerio Fiscal solicitó al foro de instancia que reconsiderara. No obstante, el tribunal de instancia mantuvo su decisión de que no existía causa probable para arresto contra el agente Sustache Sustache.
El Ministerio Público presentó por escrito una Moción de Reconsideración a la Determinación de No Causa Probable para Arresto en Alzada, el 4 de septiembre del 2007. Por su parte, la representación legal del agente Sustache Sustache sometió una Moción Urgente en Oposición a la Segunda Solicitud de Reconsideración a la Determinación de No Causa para Arresto en Alzada, el 5 de septiembre del 2007. El 6 de septiembre de 2007 el tribunal de instancia denegó la moción de reconsideración presentada por la Fiscalía. Este dictamen fue notificado el 12 de septiembre del 2007.
El 27 de septiembre de 2007 la Fiscalía optó por presentar un recurso de certiorari ante el Tribunal de Apelaciones contra la determinación de no causa probable para arresto en alzada en el caso del agente Sustache Sustache. El abogado del policía Sustache Sustache sometió una Moción en Oposición a que se Expida Certiorari, el 23 de octubre de 2007.
*272 Además, el 5 de octubre de 2007 el Ministerio Público presentó un segundo recurso de certiorari, en el que cuestionó la determinación de no causa probable para acusar a la agente Díaz De León. El 8 de octubre de 2007 el foro apelativo acogió ambos recursos de certiorari, ordenó su consolidación por contener controversias de derecho similares y le concedió un término de 15 días a los recurridos, Sustache Sustache y Díaz De León, para que comparecieran a mostrar causa por la cual no se debía expedir el auto solicitado y revocar la determinación del tribunal de instancia.
Finalmente, el 29 de noviembre de 2007 el tribunal apelativo emitió su sentencia en la cual revocó ambas decisiones del foro de instancia. Específicamente, el foro apelativo expresó que existía causa para arrestar al agente Sustache Sustache y causa para acusar a la oficial Díaz De León por el delito de agresión, en el grado de cooperador, puesto que los agentes cometieron la omisión de intervenir para evitar que el agente Pagán Cruz agrediera con los puños al occiso Cáceres Cruz, a pesar de que éste se encontraba en el piso. También, se encontró causa para arrestar al oficial Sustache Sustache y para acusar a la agente Díaz De León, por el delito de asesinato en primer grado, en calidad de cooperadores, porque ambos omitieron su deber de asistir al señor Cáceres Cruz, luego de que éste fuera atacado con un arma de fuego y herido de gravedad. Por último, el foro apelativo encontró causa para arrestar al policía Sustache Sustache y para acusar a la policía Díaz De León por el delito de encubrimiento, en la modalidad de autor, debido a que le proveyeron información falsa al fiscal sobre lo ocurrido, luego de haber cometido los delitos antes mencionados. Esta sentencia fue notificada a las partes el 30 de noviembre de 2007.
Inconforme, el agente Sustache Sustache presentó un recurso de certiorari ante este Tribunal Supremo el 28 de diciembre de 2007. Plantea que el Tribunal de Apelaciones *273 erró: (1) al decretarse con jurisdicción para revisar una determinación de no causa probable para arresto en sus méritos y (2) al determinar causa para arresto por los delitos de agresión, asesinato en primer grado y encubrimiento.(1)
El 18 de abril de 2008 ordenamos al Ministerio Público que mostrara causa por la cual no se debía expedir el auto solicitado y revocar la sentencia del Tribunal de Apelaciones. Esta resolución fue notificada el 23 de abril de 2008, y el 13 de mayo de 2008 el Procurador General sometió su Escrito en Cumplimiento de Orden.
Al tener la posición de ambas partes, procedemos a resolver, no sin antes atender ciertos cuestionamientos jurisdiccionales relacionados con la facultad del tribunal apelativo, y por ende de este foro judicial, para revisar la determinación de no causa probable para arresto.
II
A. Doctrina sobre la revisión de las determinaciones de causa probable
El magistrado que evalúa la prueba presentada, tanto en la vista de causa para arresto como en la *274 vista de causa para acusar, puede determinar que existe o no existe causa probable para lo solicitado o que hay causa probable para arrestar o acusar, según sea el caso, por un delito inferior o por un delito distinto al imputado en la denuncia.(2) La facultad de los jueces de instancia para determinar causa probable por un delito distinto al imputado está fundamentada en las Reglas de Procedimiento Criminal. Al respecto, hemos manifestado lo siguiente:
[Los] magistrados deben mantener presente que las disposiciones del inciso (c) de la citada Regla 23 de Procedimiento Criminal ... les autoriza a determinar causa probable por el delito que ellos entiendan procedente, independientemente del “delito” especificado en la “denuncia” a base de la cual se le somete el caso. Deben mantener, igualmente, presente que el procedimiento, hasta cierto punto sui géneris, que se establece en la citada Regla 23 ... hace innecesario que el Estado venga obligado a solicitar que se enmiende la denuncia, al amparo de lo dispuesto en la Regla 38 de Procedimiento Criminal, ... en la situación de que la prueba presentada demuestre la comisión de un delito distinto al imputado en la “denuncia”. Dicho de otra forma, el magistrado que preside la vista preliminar está en completa libertad de admitir la prueba que tengan a bien presentar las partes y determinar causa probable por el delito que él entienda infringido, independientemente del que se imputa en la “denuncia”. (Escolio omitido.)(3)
Ante una determinación de no causa o de causa por un delito inferior o distinto al imputado, el Ministerio Público tiene la opción de desistir de la acción penal contra el acusado, de proseguir contra éste por el delito para el cual se encontró causa o de recurrir en alzada ante un magistrado de categoría superior del Tribunal de Primera Instancia.(4) *275 A este procedimiento judicial que utiliza el fiscal para recurrir de una determinación adversa de causa probable para arrestar o acusar se le denomina “vista en alzada”.
Esta vista de causa probable para arresto o para acusar en alzada no es una apelación de la primera vista, sino un trámite independiente, separado y distinto al de la vista original.(5) Su propósito está centrado en brindarle al Estado una segunda oportunidad para conseguir una determinación favorable de causa para arresto o acusar, con la misma u otra prueba distinta a la que se ofreció en la vista original.(6) Por esto, el fiscal sólo puede utilizarla una vez, ante una determinación no favorable de causa para arresto, y una vez más para una determinación no satisfactoria de causa para acusar.(7)
Como regla general, no se permite al Ministerio Público recurrir a un tribunal de mayor jerarquía de una resolución del Tribunal de Primera Instancia que determine la inexistencia de causa probable para el arresto o para acusar.(8) A través de los años, este Tribunal ha aclarado y expandido esta norma.
Hemos establecido que un magistrado puede concluir que no existe causa probable para acusar en tres instancias. Estas son: (1) cuando la prueba desfilada du *276 rante la vista no establece a satisfacción del juzgador la probabilidad de que el delito se haya cometido o la conexión del imputado con el delito, (2) cuando la prueba desfilada durante la vista establece la probable comisión de un delito inferior o distinto al delito imputado, y (3) por razones estrictamente de derecho desvinculadas a la prueba presentada sobre la comisión del delito.(9) Si el juez de instancia determina que no hay causa probable por insuficiencia de prueba o que se ha demostrado causa probable por un delito distinto o inferior al delito imputado, este dictamen será final y no lo podrá revisar un foro de mayor jerarquía. En esas circunstancias, la vista en alzada es el único mecanismo que tiene disponible el Ministerio Público para revisar la determinación del tribunal.(10) Esto responde, a su vez, a la naturaleza peculiar de esta decisión, “dentro de un procedimiento especialmente regulado, con una finalidad esencial al ordenado y rápido curso del procedimiento criminal.”(11)
En resumen, una determinación de causa probable en los méritos no es revisable.(12) Recientemente, en Pueblo en interés menor K.J.S.R., supra, resolvimos que tampoco son revisables las determinaciones de causa probable que son producto de un análisis mixto de hecho y de derecho.(13) Sin embargo, cuando la determinación de ausencia de causa probable para acusar se basa en cuestiones estrictamente de derecho, desvinculadas de la apreciación de la prueba que fue presentada para demostrar la comi *277 sión del delito, la decisión podrá ser revisada mediante un recurso de certiorari.(14)
Debemos, pues, determinar, como cuestión de umbral, si lo que está ante nuestra consideración es una controversia de derecho que puede ser revisada mediante el recurso de certiorari. El señor Sustache Sustache argumenta que el tribunal apelativo no tenía jurisdicción —como tampoco la tendríamos nosotros— para revisar mediante un certiorari la determinación de no causa, ya que ésta fue resuelta en los méritos y no está desvinculada de la prueba desfilada en la vista. Incluso, plantea que aunque la controversia de este caso no sea estrictamente de hechos, está entremezclada con cuestiones de hechos y de derecho, por lo cual afirma que tampoco podía ser revisada ni por el foro apelativo ni por este Tribunal. Para dilucidar estos planteamientos, examinemos más de cerca nuestra decisión en el caso Pueblo en interés menor K.J.S.R., supra.
En ese caso, en la vista de causa en alzada, el Tribunal de Primera Instancia determinó suprimir la prueba que el Ministerio Público había obtenido a base de un registro ilegal y decidió que no existía causa para presentar la querella contra el menor. El Procurador General recurrió, a través del recurso de certiorari, ante el Tribunal de Apelaciones. Ese foro judicial se negó a expedir el auto por entender que las determinaciones del Tribunal de Primera Instancia en la vista inicial y en la vista en alzada, aunque se fundamentaban en cuestiones de derecho, estaban estrictamente vinculadas a la prueba. Confirmamos este dictamen sobre el fundamento de que la determinación de no causa emitida por el foro de instancia era una determinación mixta de hecho y derecho.
*278 Los hechos que suscitan la controversia que está ante nuestra consideración son claramente distinguibles de los que dieron lugar a nuestra opinión en Pueblo en interés menor K.J.S.R., supra. La determinación de suprimir una prueba, y como resultado de esta acción determinar no causa, que fue lo que sucedió en Pueblo en interés menor K.J.S.R., es principalmente una cuestión de hecho según lo hemos interpretado hasta la saciedad. Distintamente, la controversia que está ahora ante nuestra consideración es esencialmente de derecho. Las figuras jurídicas presentes en esta controversia son nuevas y nunca antes las hemos interpretado. Esta particularidad, no tan sólo suscitó una diversidad de análisis entre los abogados de defensa y los fiscales que expusieron sus argumentos legales ante el tribunal de instancia, sino que también ha creado incertidumbre entre los jueces de instancia respecto al alcance y aplicación que éstos le deben dar a esas nuevas figuras jurídicas.
Las expresiones del juez de instancia en la vista de causa probable para arresto, recogidas por el Ministerio Público en su Moción de Reconsideración a la Determinación de No Causa Probable para Arresto en Alzada, revelan la incertidumbre del magistrado sobre la interpretación en derecho de las figuras jurídicas que rigen en este caso. Dichas expresiones fueron las siguientes:
Yo no estoy obligado a explicar las razones para la determinación de no causa, pero no hay problema en decir que de la prueba que examiné, tendría que estirar mucho el delito [Art. 106] para determinar causa, aunque puede ser relacionada con otro delito que ya fue modificado en el [Nuevo] Código Penal. Por dicha negligencia se podría tomar acción en contra de él en el ámbito administrativo y laboral. (Corchetes en el original.)(15)
*279 En su escrito en oposición, el señor Sustache Sustache no objetó este relato de las expresiones del juez de instancia, como tampoco lo hizo el juez de instancia al denegar la reconsideración solicitada por el Ministerio Público.(16)
Siendo ello así, no podemos rehuir nuestra insoslayable responsabilidad de explicar las nuevas figuras jurídicas que se han incorporado a nuestro ordenamiento en el Código Penal de 2004. Por el contrario, corresponde a este Tribunal establecer la pauta hermenéutica reclamada.
Resolvemos que no existe impedimento jurisdiccional para entender en este caso y procedemos a evaluar la controversia en sus méritos.
B. El delito de comisión por omisión
Nuestro Código Penal define el término “delito” como “un acto cometido u omitido en violación de alguna ley que lo prohíbe u ordena, que apareja, al ser probado, alguna pena o medida de seguridad”.(17) Esta conceptuación es significativa porque permite conocer cuáles son los elementos fundamentales de la responsabilidad penal. Concretamente, esta disposición estatutaria presenta los cinco factores constitutivos de un delito: (1) el acto u omisión; (2) la tipicidad; (3) la antijuridicidad; (4) la culpabilidad y (5) la punibilidad.(18)
Estos cinco componentes deben ser analizados de forma secuencial. En otras palabras, no se podrá imponer a una persona alguna pena o medida de seguridad si no se prueban en un juicio, más allá de duda razonable, los primeros cuatro elementos antes mencionados.(19)
*280 El sistema jurídico penal reacciona a la conducta humana, que se convierte en punible cuando se tipifica y se le agrega la antijuridicidad y la culpabilidad.(20) En el ordenamiento penal puertorriqueño esa conducta humana se puede manifestar tanto por acciones como por omisiones.(21) Esto implica, a su vez, que se pueden infringir las disposiciones penales tanto por acciones como por omisiones. Al ser la omisión el componente de la responsabilidad penal pertinente a esta controversia, centraremos nuestro análisis en esa figura.
Las omisiones penalmente relevantes se pueden dividir en dos grandes categorías: las omisiones propias y las omisiones impropias.(22) El grupo de omisiones propias es aquel que está tipificado, de forma expresa, dentro del estatuto penal.(23) Por esto, este tipo de omisión se configura cuando se viola “un mandato de ley independientemente de la ocurrencia o no de un resultado lesivo producto de dicha infracción.”(24) Este delito requiere la voluntad de omitir la ley y se concreta, tan sólo, con un no hacer.(25) Por eso, como plantea Chiesa Aponte, la omisión propia “acarre [a] responsabilidad penal en el momento exacto en que se omite realizar la acción requerida”.(26)
Por otra parte, los delitos de omisión impropia, también denominados delitos de comisión por omisión, son *281 aquellos que se originan cuando una persona no impide la producción de un resultado, viola con su “no actuar” una norma prohibitiva y permite que sea lesionado un bien jurídico.(27) Es decir, según explica Cury Urzúa, “sólo incurre en comisión por omisión quien, encontrándose en una posición táctica de garante respecto al bien jurídicamente protegido, no actúa, a pesar de contar con el dominio final del hecho, para evitar una lesión o puesta en peligro de dicho bien”.(28) Por eso, este tipo de omisión sólo genera responsabilidad penal “cuando se produce un resultado punible como consecuencia de la omisión”.(29)
Contrario a los delitos de omisión propia, este tipo de delito requiere que no se evite un resultado.(30) Por esto, los tratadistas Jescheck y Weigend manifiestan que el delito de omisión impropia es equivalente al delito de resultado.(31) Debemos preguntarnos entonces si constituye un delito de comisión por omisión toda omisión jurídicopenal a la que le sigue un resultado. Veamos.
Los requisitos para que se configure el delito de comisión por omisión son: (1) la existencia de un deber de garante; (2) la producción de un resultado; (3) la capacidad de quien omite para cumplir con ese deber, y (4) la equivalencia entre la omisión y la producción activa del resultado que no se evitó.(32) Estas cuatro consideraciones representan la vertiente objetiva del delito de comisión por omisión.
*282 El deber de garante, primer elemento objetivo para configurar el delito de comisión por omisión, sólo puede originarse si entre el actor y la víctima existe una relación estrecha que permita imponer esta obligación.(33) Esta perspectiva del deber de garante surge de la denominada teoría de las funciones, propuesta por Armin Kaufmann, la cual, según explica Mir Puig, “fundamenta la posición de garante en la relación funcional materialmente existente entre el sujeto y el bien jurídico”. (Enfasis suprimido.)(34)
Para el tratadista Bacigalupo, esta cercanía entre el sujeto y el bien jurídico se manifiesta de dos maneras: (1) cuando quien omite está “encargado de la protección o custodia del bien jurídico que aparece lesionado o amenazado de lesión”(35) o (2) cuando se trata del “encausamiento y la custodia del peligro que emana de una fuente determinada en relación con todo bien jurídico que pudiera resultar afectado por ella.”(36) Esto implica que en los delitos de comisión por omisión, el sujeto activo que evite el resultado no puede ser cualquier persona, sino aquella que tenga el deber jurídico de hacerlo.(37)
*283 De acuerdo con el profesor Chiesa, este deber de garante u obligación de actuar no necesariamente surge de la ley, sino que “puede originarse en principios jurídicos no estatutarios, en la jurisprudencia y en la costumbre”.(38) No obstante, las fuentes más concretas en las cuales se fundamenta la obligación jurídica de actuar para impedir un resultado prohibido son la injerencia, el contrato y la ley.(39) Así lo plantea la llamada “teoría formal del deber jurídico del garante”.(40)
El deber de garante fundamentado en la injerencia le impone la obligación a una persona de asumir el control del peligro o riesgo originado por ella contra un bien jurídico.(41) Ese riesgo que afecta al bien jurídicamente protegido, según la tratadista Rodríguez Mesa, puede ser producto de una acción u omisión precedente.(42) Incluso, el tratadista Mir Puig ha manifestado que ese riesgo previamente creado o aumentado puede haber sido el resultado de una actuación lícita.(43)
Por otro lado, el deber de garante sólo surge de un contrato si uno de los sujetos asume expresamente la función de protección o custodia del bien jurídico, de forma que se origine, entre ambas partes, una situación de dependencia efectiva.(44) Más concretamente, el tratadista Welzel expone que la posición de garante surge solamente cuando una de las partes asume en un contrato esa responsabilidad y se activa “cuando comienza la situación del pe *284 ligro, de cuyo manejo está encargado el garante.”(45) En este contexto, cualquier incumplimiento del deber de actuar que cause un resultado lesivo es una omisión que genera responsabilidad penal.(46)
Un deber de garante también puede estar reconocido en un estatuto. No obstante, debe tratarse de un precepto jurídico extrapenal, porque los deberes de actuar impuestos por las leyes penales sólo pueden dar lugar a delitos de omisión pura.(47) La obligación de los policías de proteger a los ciudadanos es un ejemplo de un deber de garante dispuesto en una ley. Al respecto, la Ley Orgánica de la Policía de Puerto Rico dispone lo siguiente:
Se crea en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará “Policía de Puerto Rico” y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir, investigar y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a éstas se promulguen. (Énfasis suplido.)(48)
Esta obligación de actuar que tienen los policías también fue incorporada al Reglamento de Personal de la Policía de Puerto Rico. En lo pertinente, esta normativa establece:
Dentro de la esfera de sus atribuciones todo miembro de la Fuerza tendrá, entre otras, las siguientes obligaciones y responsabilidades:
1. Proteger la vida y propiedad, impedir el crimen y el desorden.
2.....
*285 3. Cumplir y velar por el cumplimiento de las leyes, reglamentos y ordenanzas municipales.
4. Observar y procurar la protección de los derechos civiles del ciudadano.
5. Observar en todo momento una conducta ejemplar.
6. Tomar las providencias necesarias para garantizar la protección de la persona detenida.
7. Tratar cortésmente al público y prestar la debida ayuda a las personas que la requieran.
8. Prestar la debida protección al pueblo reunido legalmente para cualquier fin lícito.
9.....
10. Ser puntual en sus compromisos oficiales y diligente[s] en el cumplimiento de su deber, actuando siempre en forma ecuánime, serena y justa.
11. Orientar y aconsejar al público sobre el mejor cumplimiento de la ley así como en todo lo que concierne a la seguridad pública. (Enfasis suplido.)(49)
Los agentes del orden público que cumplen con sus funciones, siguiendo los parámetros impuestos por su ley orgánica y los reglamentos administrativos de la Policía de Puerto Rico, no tendrán que responder penalmente por cualquier actuación que haya resultado del ejercicio legítimo de su autoridad o cargo. Sobre el particular, el Código Penal de 2004 dispone que “[n]o incurre en responsabilidad quien obra en cumplimiento de un deber jurídico o en el legítimo ejercicio de un derecho, autoridad o cargo”.(50)
No obstante, este privilegio legislativo no puede ser invocado por los policías si éstos, al cumplir con los deberes de su cargo, ejercen un grado de fuerza excesivo e injustificado. La Ley Orgánica de la Comisión de Investigación, Procesamiento y Apelación (CIPA), cuya función es sancionar el “mal uso o abuso” de autoridad por funcionarios del orden público, establece los actos que son constitutivos de abuso de autoridad, entre otros:
*286 (a) Arrestos o detenciones ilegales o irrazonables;
(c) acometimiento y /o agresión injustificados o excesivos',
(e) dilación indebida en conducir ante un magistrado a una persona arrestada o detenida;
(f) uso de violencia injustificada, coacción física o psicológica, intimidación o prolongación indebida, sobre o de una persona arrestada, o detenida para fines de investigación',
(o) obstruir, impedir o interrumpir ilegal o irrazonablemente el ejercicio legal y pacífico de las libertades de palabra, prensa, reunión y asociación, y de libertad de petición en las vías o lugares públicos. (Énfasis suplido.)(51)
En otras palabras, un agente del orden público incumplirá con su deber de garante, respecto a un ciudadano, cuando al efectuar un arresto cometa cualquiera de dichos actos. Este tribunal ha concurrido con esta consideración al resolver que un agente puede ser procesado por el delito de agresión si su conducta refleja el uso de fuerza excesiva contra un ciudadano.(52)
Por otra parte, hay que tener claro que a los policías no se les puede castigar por la comisión de un delito que no impidieron, por el mero hecho de tener la obligación de actuar para impedir que se cometiera.(53) El profesor Chiesa Aponte coincide con esta apreciación, puesto que “ [n] ingún sistema jurídico estaría dispuesto a imponerle responsabilidad penal a los policías por la comisión de los delitos que no lograron evitar”.(54)
Ante este planteamiento, se puede afirmar que la clave para concluir que un policía ha cumplido con su deber de garante es que éste haya intentado evitar la co *287 misión del delito y que, en ese intento, no haya podido impedir el resultado. Esto porque al autor de una omisión no se le castiga por causar el resultado típico, sino por no evitarlo.(55) En ese sentido, quien asume una posición de garante tiene la responsabilidad de tratar activamente de impedir el resultado prohibido.(56) En otras palabras, el garante se convierte en un “protector activo”, por lo cual el cumplimiento de su obligación no se limita a un mínimo, según señala Novoa Monreal, sino que incluye el prevenir, ayudar, instruir, defender y proteger al bien jurídico amenazado.(57)
El segundo requisito para que se configure el delito de comisión por omisión es la producción efectiva del resultado. Welzel lo define como la “producción de un resultado típico en el sentido de un delito de comisión, o sea, la muerte, la lesión corporal, la privación de libertad, el incendio, etc. ...”.(58) En fin, es el daño que crea una persona que está en posición de garante respecto al bien jurídico, a pesar de tener la capacidad para realizar la acción omitida.
Comprobada la lesión y la omisión de haber actuado como “protector activo” en función de un deber de garante, se activa la necesidad de comprobar el tercer componente del delito de omisión impropia: la capacidad de quien omite. Esto debido a que sólo generan responsabilidad penal las omisiones de una persona capacitada para realizar el acto omitido.(59)
Con este requisito se pretende saber “si el autor hubiera podido realizar voluntariamente la acción que hubiera impedido la producción del resultado”.(60) Esta capacidad de *288 actuar se mide en términos de dos consideraciones: la posibilidad física real de evitar el resultado y los presupuestos intelectuales de evitar el resultado.(61)
La primera consideración se refiere a que la conservación de un bien jurídico estará supeditada a los conocimientos especiales y las habilidades de la persona que tiene la responsabilidad de evitar el resultado.(62) La segunda consideración, a su vez, requiere comprobar dos elementos: el conocimiento de la situación típica que tiene el que está en posición de garante y la posibilidad que éste tiene de reconocer los medios para realizar la acción mandada y conservar el bien jurídico amenazado; es decir, para evitar el resultado.(63)
La capacidad de realizar la acción debida es un factor que está estrechamente atado al cuarto elemento del delito de comisión por omisión: la equivalencia entre la omisión y el resultado. Este último componente se activa porque la infracción del deber jurídico, aunque es una condición necesaria, no es suficiente para configurar el criterio de la equivalencia.(64) Concretamente, para la tipicidad de la comisión por omisión no será suficiente la infracción de un deber legal, contractual o un actuar precedente peligroso, sino que será necesario que la omisión de quien debería haber actuado, equivalga a causar el resultado, o lo que muchos tratadistas denominan como “causación”.(65)
Rodríguez Mesa apunta que los delitos de comi *289 sión por omisión “carecen del presupuesto de la imputación objetiva requerido por los delitos comisivos de resultado”, es decir, que carecen de “la necesaria relación de causalidad entre el comportamiento llevado a cabo por el sujeto y el resultado acaecido”.(66) En otras palabras, para este tipo de delito no se exige que se pruebe una causalidad estricta entre la omisión y la producción del resultado. Así lo afirma también el tratadista Bacigalupo al exponer lo siguiente:
En la dogmática moderna del delito los problemas de la causalidad han perdido considerable significación. Hoy no se pregunta si una acción o una omisión son causales del resultado, sino si el resultado es objetivamente imputable a la acción o a la omisión. ...
... Dicha relación se da, en opinión prácticamente unánime, cuando la acción omitida hubiera evitado el resultado producido. Sobre estas bases ya no se trata de afirmar la causalidad real de la omisión respecto del resultado, sino la “causalidad potencial” de una acción no llevada a cabo. (Enfasis en el original y escolio omitido.)(67)
Por esto, se hizo necesario identificar un elemento que desempeñara, en los delitos de comisión por omisión, la función que realiza la relación de causalidad en los delitos activos, de manera tal que actuara como equivalente funcional de la causalidad activa.(68) De esta preocupación se originaron diversas teorías que contribuyeron a elaborar diferentes criterios para posibilitar que el no evitar el resultado fuera equivalente a causarlo de manera activa. Entre éstas, la teoría de la causalidad hipotética ha resultado ser la doctrina dominante.
La causalidad hipotética es “la posibilidad táctica que tuvo el sujeto de evitar el resultado”.(69) La deter *290 minación de la posibilidad de evitar el resultado, según Bacigalupo, se realiza mediante un juicio causal hipotético que no sostiene una realidad, sino una probabilidad de tal naturaleza que debe permitir concluir “que el resultado se hubiera evitado con una seguridad rayana en la certeza”.(70) Por esto, cuando se puede predecir con un grado de probabilidad lindante a la certeza que un resultado se hubiera evitado al realizar la acción omitida, el no evitar el resultado equivale a producirlo.(71)
Los tratadistas Heinrich Jescheck y Weigend coinciden con esta apreciación. Indican que en la omisión no hay que exigir la plena certeza en torno a la causalidad, en claro contraste con el hacer positivo. Manifiestan que el análisis debe fundamentarse sobre un suceso que no se puede predecir con seguridad absoluta y no en el curso real de los eventos.(72) Es decir, “se trata de un juicio hipotético sometido inevitablemente a un margen de error”.(73)
Ante este enfoque teórico, no es necesario afirmar una verdadera relación de causalidad, sino que basta que el sujeto hubiera podido evitar dicho resultado cuando se encontraba en posición de garante.(74) Más concretamente, la equivalencia requerida “debe interpretarse de tal forma que sólo implique que tiene que existir una relación de causa próxima entre la omisión de realizar la acción requerida y la producción del resultado”.(75)
La figura jurídica denominada “comisión por omisión” u “omisión impropia” se incorporó a nuestro ordenamiento en el Código Penal de 2004. Allí se define la re *291 lación de causalidad propia de esta modalidad de delito de la forma siguiente:
Los delitos que tipifican la producción de un resultado sólo podrán cometerse por omisión cuando la no evitación del mismo equivalga a su producción activa.
Para determinar la equivalencia de la omisión a la acción se tendrá en cuenta la existencia de un deber específico de evitar el resultado y si una acción anterior del omitente hace posible imputarle la situación de riesgo en que se encontraba el bien jurídico lesionado.(76)
Los antecedentes de este artículo sobre el delito de comisión por omisión tienen su base en el Artículo 11 del Código Penal español, y en el Artículo 13 del Código Penal de Alemania. En el Código Penal español el delito de comisión por omisión se define de la manera siguiente:
Los delitos o faltas que consistan en la producción de un resultado sólo se entenderán cometidos por omisión cuando la no evitación del mismo, al infringir un especial deber jurídico del autor, equivalga, según el sentido del texto de la Ley, a su causación. A tal efecto se equiparará la omisión a la acción:
a) Cuando exista una específica obligación legal o contractual de actuar.
b) Cuando el omitente haya creado una ocasión de riesgo para el bien jurídicamente protegido mediante una acción u omisión precedente.(77)
Por su parte, el Código Penal de Alemania define el término jurídico “delito de comisión por omisión” de la forma siguiente:
... I. Quien omita evitar la consumación de un tipo penal será penado, según este Código, sólo si jurídicamente tiene que responder de que no se produzca la consumación, y cuando la omisión corresponda a la realización del tipo penal a través de un hacer.
*292 II. La pena, de acuerdo [con a la Sección] 49, apartado I, podrá ser atenuada.(78)
Nevares-Muñiz señala que en el ordenamiento penal de Puerto Rico este tipo de delito requiere, en primer lugar, que el sujeto activo esté obligado a evitar el resultado típico, lo cual, según hemos visto, es conocido jurídicamente como el deber de garante, y en segundo lugar, que la omisión equivalga a una acción.(79) Esta equivalencia de la omisión del sujeto activo a la producción activa del resultado se determina a base de dos criterios principales: (1) el deber de garante y (2) una acción anterior que haga posible imputarle el resultado al que está en posición de garante.(80)
El tratadista Mir Puig fue pieza clave para definir y estructurar los requisitos que conforman la imputación objetiva del delito de comisión por omisión en nuestra normativa penal. Su análisis sobre el delito de comisión por omisión fue incorporado al Informe de la Comisión de lo Jurídico del Senado, al indicarse, específicamente, lo siguiente:
“En la redacción propuesta la existencia del deber de evitar un resultado se convierte en un elemento a tener en cuenta, pero por sí solo no es determinante de la equivalencia de la omisión a la acción, en los delitos que tipifican la producción o causación de un resultado. El elemento determinante para equiparar la omisión a la acción es que el omitente haya creado o aumentado el riesgo del bien jurídico, cuya lesión no evita, aunque haya sido en un momento anterior y de forma lícita.”
El segundo elemento conducente a la equiparación de la omisión a la acción, aunque tampoco opera automáticamente, incorpora el criterio material y decisivo ... que tiene que ver con la clásica conducta precedente, pero hablando de imputa *293 ción en lugar de causación. Ello flexibiliza este criterio en lo objetivo (incluye fácilmente el haber determinado que el sujeto se hubiera puesto en peligro o que otras personas lo hubieran hecho, o que otros no hubieran podido socorrer, etc.); e incluye también la necesidad de tener en cuenta si la contribución al riesgo fue voluntaria o imprudente, como criterios subjetivos de la imputación del riesgo al omitente.(81)
Es importante recalcar que si bien “[l]a creación o aumento de un riesgo imputable en un momento anterior no es todavía típica”, sí permite establecer, según señala Mir Puig, “que el omitente no es ajeno al peligro del bien jurídico, sino que es responsable de dicho peligro y está obligado personalmente a evitar que se convierta en lesión”.(82) Ante esta consideración, no es suficiente que quien omite haya causado o aumentado el riesgo, sino que lo haya hecho de forma voluntaria o en el ejercicio de determinadas funciones, familiares o sociales, que justifiquen el atribuirle responsabilidad por crear o aumentar dicho riesgo.
Al abundar sobre el criterio del riesgo precedente a la omisión, Mir Puig recalca que el derecho penal no busca añadir nuevos riesgos a los que ya existen, sino todo lo contrario, puesto que el ordenamiento penal prohíbe y penaliza “la creación activa de determinados riesgos y lesiones”. De igual forma, la normativa penal permite la creación de riesgos lícitos sólo si se controlan y se evita que se conviertan en lesión.(83)
Este análisis del riesgo precedente a la omisión se complementa con la figura jurídica del “riesgo permitido”, la cual se define en nuestro Código Penal de la forma siguiente:
No incurre en responsabilidad [penal] la persona que ha causado un resultado tipificado como delito si dicho resultado *294 no constituye la realización de un riesgo suficiente y no permitido originado por su conducta.(84)
En el caso de los delitos de comisión por omisión, hay riesgo suficiente y no permitido cuando el sujeto activo está en posición de garante respecto al sujeto pasivo y la ejecución del acto omitido hubiera evitado el resultado.(85)
En resumen, los factores que constituyen la imputación objetiva del delito de comisión por omisión son: (1) la existencia de un deber de garante, (2) la producción del resultado, (3) la capacidad para actuar y (4) la equivalencia entre la omisión y el resultado, que se determina a base de la existencia de un deber de garante y de la creación o el aumento de un riesgo precedente, también conocido como “injerencia”. Esta interpretación de esta nueva figura jurídica es coherente con la intención legislativa y los propósitos del nuevo Código Penal.(86) Además, es coherente con el principio de legalidad, el cual promulga que “no se instará acción penal contra persona alguna por un hecho que no esté expresamente definido como delito en [el Código Penal] o mediante ley especial ...”.(87)
Estos serán los elementos que tomaremos en consideración para determinar si el Estado presentó prueba suficiente para demostrar la existencia de causa para arrestar al señor Sustache Sustache como cooperador del delito de asesinato en primer grado y agresión en la modalidad de comisión por omisión. De ser así, el foro de instancia deberá igualmente utilizar los criterios antes discutidos para determinar, tras seguir el procedimiento judicial correspondiente para cada acusado, si el señor Sustache Sustache cometió dicho delito en la modalidad de comisión por omisión.
*295 C. La figura jurídica del cooperador(88)
La comisión de un delito puede ser realizada por una sola persona, o varias personas pueden contribuir, de alguna manera, a la ejecución del delito. Este fenómeno de la cointervención en un delito se ha convertido en uno de los asuntos más complejos y discutidos por diversos tratadistas especializados en la materia de derecho penal. Así, han surgido dos enfoques teóricos principales que, a su vez, se han encargado de establecer criterios particulares para permitir distinguir entre las formas de autoría y de participación. Estos enfoques son la “teoría de la equivalencia”, también denominada “sistema unitario o causalista”, y la “teoría de la diferenciación”. (89) La primera está vigente en la mayoría de las jurisdicciones de derecho anglosajón y la segunda es la que impera en las jurisdicciones de derecho civil.(90)
La teoría de la equivalencia, o sistema unitario, supone “afirmar la autonomía de la responsabilidad penal de todos los intervinientes en un delito”.(91) Esto implica que los sistemas unitarios interpretan de forma extensiva el tipo, de manera que toda conducta de intervención en el *296 delito pueda ser considerada típica.(92) De esta forma, según esta teoría se trata de manera similar al autor y al cooperador.(93) El tratadista alemán Jakobs coincide con este análisis al expresar que según este concepto unitario de autoría, todo el que participe en la comisión de un delito se considerará autor del hecho antijurídico y culpable, “sin tener en cuenta las cualidades delictivas de la contribución de los demás que toman parte (dolosa, imprudente, inevitable; culpable, inculpable) y sin más que un vínculo causal con el estado de desarrollo de las aportaciones de los otros (preparación, tentativa, consumación)”.(94)
Por consiguiente, este enfoque teórico renuncia al principio de accesoriedad, que tiene como objetivo principal no sólo distinguir entre las figuras de autor y partícipe, sino establecer la responsabilidad de éste como accesoria y dependiente de la de aquél.(95) La única accesoriedad que admite esta teoría es la fáctica, “en el sentido de que las conductas de los participantes en el hecho se complementan entre sí para producir entre todas el resultado delictivo, de forma que para entender una aportación es necesario analizarla dentro del conjunto”.(96)
Por su parte, la teoría de la diferenciación distingue entre los sujetos activos de un hecho punible y los clasifica como autores o partícipes, porque entiende que la participación en sí misma no es más que “un concepto de referencia que supone siempre la existencia de un autor principal en función del cual se tipifica el hecho cometido”.(97) Por ende, para esta tendencia, la participa *297 ción es accesoria y la autoría es principal.(98) De esta forma, distinto a la “teoría de equivalencia”, la teoría imperante en los países civilistas reconoce y valida el principio de accesoriedad. Por un lado, se reconoce a un “grupo de participantes principales que derivan su punibilidad de la adecuación de su conducta al tipo penal”.(99) Por otro lado, se admite la posibilidad de que otros sujetos intervengan de manera secundaria o accesoria, derivándose su punibilidad, “al menos en parte, no de la directa tipicidad de su conducta, sino del favorecimiento del hecho típico realizado por los primeros”.(100)
Por consiguiente, bajo la “teoría de la diferenciación” se requiere que el hecho esté calificado como delito en la persona del autor para que se pueda exigir responsabilidad penal a los partícipes.(101) Esto quiere decir que en los sistemas diferenciadores la participación sólo se hace patente y evidente ante la autoría de otro. Es por eso que esta teoría se inclina a penalizar más severamente al autor del delito que al cooperador.(102)
Nuestro ordenamiento penal se suscribió durante más de un siglo a la “teoría de la equivalencia”.(103) El derogado Código Penal de 1902(104) incluía en la categoría de inter *298 vención a los autores y a los ayudantes después del hecho, a los cuales calificó como cómplices.(105) Como era errónea esta clasificación, este Tribunal Supremo definió el concepto jurídico de “cómplice” como aquella persona que, con pleno conocimiento y voluntariedad, sin mediar coacción ni amenaza e intencionalmente, participa de alguna forma en la comisión de un delito.(106) Al ser incompatible esta nueva definición con la descripción que proveía el derogado Código Penal de 1902, el Informe de la Comisión de lo Jurídico sobre el P. del S. 753 —que se convirtió en el Código Penal de 1974— recomendó que se eliminara el concepto “cómplice” y se sustituyera por el de “encubridor”.(107) Específicamente, se sugirió incluir la noción de cómplice como parte del tipo de autor comprendido en los incisos (d) y (e) del Artículo 35 del Código Penal de 1974 (33 L.P.R.A. sec. 3172).(108) De esta forma, el Código Penal de 1974 mantuvo el enfoque anglosajón de la “teoría de la equivalencia”, al clasificar a los intervinientes de un hecho delictivo sólo como autores o encubridores.(109)
De acuerdo con el profesor Granados Peña, “[e]l tratamiento indiferenciado de los intervinientes en el delito, esto es, de los autores y partícipes, establecido en el artículo 35 del código penal derogado, constituye uno de los *299 mayores desaciertos de la vieja legislación punitiva”.(110) Este tipo de inquietud, junto al planteamiento que hizo el Departamento de Justicia en 1992 y, nuevamente, en 2002, respecto a que se debía atender la participación del sujeto activo según la intensidad de dicha participación, fueron los que provocaron que en el Código Penal de Puerto Rico de 2004 se adoptara, por primera vez, la teoría civilista de la diferenciación.(111) De esta forma, el ámbito de aplicación del delito fue distribuido entre los autores y los cooperadores, sin importar que éstos fueran personas naturales o jurídicas.(112) Al cooperador se le trata de forma más benigna que al autor, al imponérsele “una pena igual a la mitad de la pena señalada para el delito o su tentativa, según corresponda, hasta un máximo de diez (10) años”.(113)
Este nuevo ordenamiento penal define a los autores como aquellos quienes:
(a) ... toman parte directa en la comisión del delito.
(b) ... fuerzan, provocan, instigan o inducen a otra persona a cometer el delito.
(c) ... se valen de una persona inimputable para cometer el delito.

(d) ... cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo.

(e) ... se valen de una persona jurídica para cometer el delito [o]
(f) ... actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta *300 delictiva, aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica. (Énfasis suplido.)(114)
Mientras, el estatuto especifica que los cooperadores son “los que sin ser autores, con conocimiento, cooperan de cualquier otro modo en la comisión del delito”. (Enfasis suplido.)(115)
La adopción de la “teoría de la diferenciación” resulta ser uno de los aspectos más novedosos del nuevo Código Penal de Puerto Rico.(116) Sin embargo, como toda novedad, ésta también plantea cuestiones que aún no he-mos tenido ocasión de considerar, como lo es la manera de distinguir entre la figura del autor incluida en el Artículo 43(d) del Código Penal de 2004 (33 L.P.R.A. sec. 4671(d)), y la figura jurídica del cooperador a la cual se refiere el Artículo 44 del estatuto penal, 33 L.P.R.A. see. 4672. De entrada, hay que recalcar que ambas figuras son formas de intervención en un delito. No obstante, la primera es una forma de autoría, mientras la segunda es un tipo de participación.
Sabemos que la autoría tiene tres modalidades: la autoría directa, la autoría mediata y la coautoría.(117) El autor al que se refiere el Artículo 43(d) del Código Penal de 2004, supra, que es el que coopera “con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo” (énfasis suplido)(118) es una manifestación de la forma de autoría denominada “coautoría”.
*301 En nuestra jurisdicción, este fenómeno de la coautoría, también conocida como “complicidad”, originalmente fue producto de una interpretación jurisprudencial en la década de 1960.(119) Eventualmente, este concepto jurídico se incorporó al Artículo 35(d) y (e) del Código Penal de 1974 (33 L.P.R.A. sec. 3172(d) y (e)), y se mantuvo en la definición de “autor” del Artículo 43(d) del Código Penal de 2004, supra.(120) Por esto, a este tipo de interventor se le conoce en Puerto Rico como “coautor” o “cómplice”.
Nuestra jurisprudencia ha limitado la aplicación del concepto de coautor a aquellas personas que participan consciente e intencionalmente en la comisión de un delito. Esto porque se requiere probar que los autores actuaron en concierto y común acuerdo, como parte de una conspiración o designio común. En otras palabras, se necesita establecer algún grado de consejo, incitación o participación directa o indirecta en el hecho punible. La mera presencia de una persona, durante la comisión de un delito, no lo convierte en coautor. Tampoco se considera coautor a aquella persona quien, sin saberlo, participa o coopera en la comisión de un delito.(121)
Esta modalidad de intervención en un delito ha sido incorporada en la definición del concepto “autor” de los estatutos penales de diversas jurisdicciones europeas, entre ellas, España y Alemania.(122) La manera amplia en que el Código Penal de España ha definido el concepto “autor” *302 creó en ese país una dificultad para distinguir el fenómeno del coautor de la figura del cooperador necesario que se incluye en su Artículo 28(b). Los estudiosos del derecho penal han definido la coautoría como la intervención común, consciente y voluntaria de un grupo de personas en la ejecución de un delito.(123) Este tipo de autoría sólo puede surgir si están presentes dos elementos principales: (1) un acuerdo de distribución de funciones entre las personas involucradas y (2) la ejecución común del hecho.(124) Respecto a este segundo factor, el tratadista Bacigalupo afirma que el codominio del hecho es el factor fundamental de la coautoría.(125) Más concretamente, este autor expresa lo siguiente:
La aportación objetiva que determina la existencia de un codominio del hecho puede resumirse en una fórmula de utilización práctica: habrá co-dominio del hecho cada vez que el partícipe haya aportado una contribución al hecho total, en el estadio de la ejecución, de tal naturaleza que sin ella aquél no hubiera podido cometerse. Para el juicio sobre la dependencia de la consumación del hecho de la aportación del partícipe es *303 decisivo el plan de realización tenido en cuenta por los autores. (Escolio omitido.)(126)
Este segundo criterio es precisamente el que posibilita la distinción entre la coautoría y la cooperación necesaria. Es cierto que ambos supuestos de autoría son determinantes para que se pueda ejecutar el delito. No obstante, la figura de la cooperación necesaria, distinto a la coautoría, “presupone ausencia de intervención en el proceso ejecutivo material del delito”.(127) El “cooperador necesario” es aquel que contribuye en la preparación del delito, de forma que éste no se hubiera podido cometer sin tal aportación.(128) Esto implica que mientras el aporte del coautor se efectúa durante la ejecución del delito, la contribución del cooperador necesario se brinda en los actos preparatorios del delito.(129)
La confusión existente entre los conceptos de “coautor” y “cooperador necesario”, que se originó por la definición de autor que se incorporó en el Código Penal de España, provocó que muchos estudiosos de la materia de derecho penal impulsaran la idea de eliminar la llamada “autoría” por “cooperación necesaria”, por entender que en la autoría conjunta se podían incluir todos los supuestos que usualmente se trataban como una cooperación necesaria. El objetivo principal de esta iniciativa era evitar los esfuerzos para distinguir entre ambas figuras jurídicas y poder definir mejor la estricta complicidad.(130)
En nuestro ordenamiento penal no existe esta dificultad en delimitar la figura de “coautoría” para distinguirla de la “cooperación necesaria”, puesto que el tipo de *304 autor que se incluye en el Artículo 43(d) del Código Penal de 2004, supra, combina las características de la co-autoría y la cooperación necesaria. Esto se hace patente al examinar la disposición estatutaria que clasifica como autor a toda persona que coopere “con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo”.(131) De esta modalidad de autor se puede inferir que las contribuciones medulares a la ejecución del hecho delictivo son aquellas que se realizan tanto en los actos preparativos del hecho punible como en su ejecución.
La figura del “cooperador” que el Código Penal de 2004 introdujo como un nuevo tipo de interventor en la comisión de un delito, es decir, quien “sin ser auto[r], con conocimiento, cooper[a] de cualquier otro modo en la comisión del delito”, no tiene antecedente directo en el derogado Código Penal de 1974.(132) Sin embargo, es comparable con la definición de “cómplice” en el Código Penal de España. Específicamente, el Artículo 29 de dicho Código español establece, en lo que nos concierne, que “son cómplices los que ... cooperan en la ejecución del hecho con actos anteriores o simultáneos”.(133)
En esta nueva forma de participación, que se denomina “cooperación”, se incluye a las personas que “ayudan pero no participan directamente en la planificación o ejecución del delito, ni tienen conocimiento pleno del mismo”.(134) Esto significa que la colaboración que el cooperador brinda a la comisión del delito no es suficiente para satisfacer los requisitos de la autoría del Artículo 43(d) del Código Penal de 2004, supra, el cual requiere que la participación del *305 coautor en el hecho punible sea indispensable. Por el contrario, la participación del cooperador no es ni imprescindible ni indispensable para la ejecución del delito, pues el cooperador no es quien tiene el dominio del hecho.(135) Evidentemente, la cooperación, al igual que la figura de la complicidad en España, está totalmente influenciada por el principio de accesoriedad.(136) La participación del cooperador es, pues, subsidiaria a la intervención del autor y sólo se activará cuando el Artículo 43(d), supra, no aplique.(137)
Por eso se plantea que el cooperador sólo contribuye en un delito ajeno.(138) Esa ayuda que el cooperador otorga al hecho principal puede ser un mero apoyo sin influjo decisivo.(139) El tratadista Quintero Olivares coincide con esta interpretación. Indica que aunque la cooperación punible se manifiesta en “una colaboración o ayuda útil y operante en la ejecución del delito ... permitiendo así que esa ejecución sea más rápida y eficaz”, esta conducta siempre será considerada como “subalterna y periférica ... aunque deba ser en todo caso relevante”. (Énfasis suprimido.)(140) De acuerdo con el tratadista Mir Puig, esto es así porque “a diferencia de quien realiza el tipo como autor en sentido estricto, que es punible autónomamente, el ‘partícipe’ sólo puede ser castigado si existe un hecho antijurídico por parte del autor”.(141)
La doctrina española reconoce que para que un *306 partícipe sea considerado como un cómplice (cooperador) no es necesaria una relación de causalidad tal que su conducta sea condicionante del resultado —que es lo que define la autoría— sino que “basta para la cooperación un favorecimiento eficaz del hecho”.(142) En otras palabras, para que una conducta pueda ser considerada como una cooperación, ésta deberá ser de tal manera causal que realmente haya acelerado, asegurado, incrementado o facilitado la ejecución del delito o intensificado su resultado.(143) No obstante, la ausencia de este tipo de participación no afectará la realización del hecho delictivo.(144)
La cooperación punible se concibe en los delitos de comisión por omisión cuando una persona que tiene una obligación de garante respecto a otra no realiza una acción que hipotética y previsiblemente hubiera podido aminorar o impedir la comisión del delito por el autor, no obstante tener la capacidad y oportunidad para hacerlo.(145) La tratadista López Peregrin, al referirse a la figura del cómplice en el Código Penal español, equivalente a nuestro “cooperador”, aclara que esa “conducta omisiva del cómplice debe ser equivalente valorativa y estructuralmente, no a la causación del tipo correspondiente de la Parte especial (lo que lo convertiría en autor), sino a la causación del tipo de la complicidad [cooperación], en el sentido de haber favorecido la comisión del delito por el autor”. (Escolio omitido.)(146)
La delimitación de la figura del cooperador del *307 Artículo 44 del Código Penal de 2004, supra, y la del coautor del Artículo 43(d) del mismo Código, supra, constituye uno de los principales problemas prácticos del nuevo Código Penal de Puerto Rico. Para superar este conflicto y establecer unos criterios particulares que faciliten distinguir entre ambos conceptos penales, se han elaborado diversas teorías, principalmente las que se fundamentan en uno de los elementos siguientes: (1) la necesidad de los actos realizados para la producción del resultado, (2) los bienes escasos, (3) la relevancia de la aportación del cooperador en el proceso motivacional del autor y (4) el dominio del hecho.(147)
El primer enfoque teórico está orientado a distinguir entre diversos grados de necesidad, con miras a precisar el concepto de “cooperación necesaria”. Concretamente, esta doctrina fundamenta la distinción entre una cooperación necesaria y la no necesaria en el valor que tienen los actos con relación al resultado, según producido por el autor del delito. En ese sentido, los actos llevados a cabo por el cooperador se considerarán necesarios cuando ninguno de los demás intervinientes hubiera podido sustituirlo. Distintamente, si cualquiera de los participantes en el delito podía realizar la acción, esta contribución será clasificada como una complicidad o una cooperación no necesaria.(148)
Esta perspectiva también establece que la dis *308 tinción entre la cooperación necesaria y la no necesaria se logra al evaluar si el autor podía ejecutar el delito sin la colaboración ajena. La aportación será clasificada como necesaria siempre que el autor hubiera tenido que descartar o aplazar la comisión del delito hasta obtener una contribución similar. Por el contrario, la colaboración no será necesaria si el autor podía ejecutar el hecho sin la ayuda del cooperador.(149)
La segunda teoría elaborada para delimitar la figura del cooperador —la de los bienes escasos— aborda específicamente lo que se entiende por necesidad, con relación a la cooperación. En esta vertiente teórica, “la aportación del cooperador debe considerarse necesaria dependiendo de la escasez de la cosa o servicio que se facilitó [para ejecutar el delito]”.(150) Se clasificará como “cooperación necesaria” aquella colaboración escasa que sea causa del resultado. Mientras, será “complicidad” aquella contribución, abundante o escasa, que no haya condicionado la ejecución del delito.(151) En fin, según esta teoría, “mientras más escaso es el bien o el servicio suministrado, más necesario es para la comisión del delito. Por el contrario, mien *309 tras menos escaso sea el bien o servicio suplido, menos necesario es para la comisión de la ofensa”.(152)
La tercera teoría delimita el ámbito entre la cooperación necesaria y la no necesaria al realizar un juicio sobre la contribución sicológica del colaborador en el proceso motivacional del autor. Más concretamente, la cooperación necesaria se activaría “cuando el partícipe incide en el proceso de decisión del autor, motivándolo con su ayuda a ejecutar el delito”.(153)
Por último, la teoría del dominio del hecho, en sus orígenes, postulaba que “en los delitos dolosos [sólo] es autor quien domina finalmente la ejecución del hecho ...”.(154) Esta perspectiva teórica ha variado su orientación al imponerse un análisis integrado de las doctrinas subjetivas y objetivas. De acuerdo con esta nueva visión, el dominio del hecho supone, no sólo un control final (subjetivo), “sino también una posición objetiva que determine ... el curso del suceder típico”.(155) Más concretamente, Bacigalupo ex-presa que en la moderna teoría del dominio del hecho “no se trata de la causación de efectos en el mundo exterior, sino de la realización de un fin, que es el resultado de una elección entre diversas alternativas y posibilidades de acción en relación al fin que el agente se propone”. (156)
Para atender situaciones diversas de autoría, esta teoría impulsa tres tipos distintos de dominios. Estos son: (1) el dominio de la propia acción típica, que se refiere a las *310 personas que realizan el hecho por sí mismas; (2) el dominio de la voluntad de otros, que son los quienes realizan la acción, es decir, el dominio que ejerce el autor mediato, y (3) el dominio funcional del hecho, que se da entre los partícipes que actúan conjuntamente y quienes, de acuerdo con el plan delictivo, se distribuyen el trabajo sin que ninguno posea el dominio total del hecho.(157) Por ser el pertinente a esta discusión, examinemos el supuesto del dominio funcional del hecho.
El dominio funcional del hecho está fundamentado en un plan delictivo común en el que varios sujetos se dividen las actividades.(158) Según este enfoque teórico, se exige que la contribución del coautor sea esencial.(159) Esta esencialidad, según la tratadista López Peregrin, se establece a base del supuesto de que en la coautoría es preciso que todos los sujetos actúen para que se pueda cometer el delito, mientras que uno solo puede tener la capacidad para impedirlo.(160)
En resumen, según el tratadista Granados Peña, “el que la conducta de un interviniente se eleve a la categoría de autor o se degrade a la de cómplice [cooperador], depende de la presencia de cuatro factores: El grado de interés en el resultado, el alcance de la intervención en el hecho, el dominio del hecho, o por lo menos, la voluntad del dominio del hecho”.(161)
El estudio y análisis de todos estos postulados nos llevan a afirmar que la distinción entre el coautor del *311 Artículo 43(d) y el cooperador del Artículo 44 del Código Penal de 2004 radica en dos consideraciones principales: (1) la colaboración del coautor es indispensable para la comisión de un delito, mientras que la del cooperador no lo es, y (2) el coautor tiene un mayor conocimiento sobre el hecho punible que el cooperador. Sobre el segundo aspecto, puede establecerse que el coautor es quien participa en la elaboración del plan desde sus actos preparatorios, simultáneos y hasta los posteriores a la comisión del delito, siempre que éstos fueran concertados desde el principio del acuerdo.
Es cierto que el Artículo 44 del Código Penal de 2004, supra, expone que el cooperador, con conocimiento, contribuye de cualquier otro modo a la comisión del delito.(162) No obstante, el Informe sometido por la Comisión de lo Jurídico del Senado y nuestro análisis de la figura demuestran que el cooperador “[no] tien[e] un conocimiento pleno del [delito]”,(163) Esto debido a que el cooperador “no participa directamente en la planificación o ejecución del delito .. ,”.(164) Siendo ello así, es imperativo precisar cuál es el conocimiento que debe tener el cooperador.
El Código Penal de Puerto Rico dispone que ninguna persona podrá ser sancionada “por un hecho previsto en una ley penal si no lo ha realizado con intención o negligencia”.(165) Este principio de responsabilidad subjetiva persigue imputarle a un individuo las acciones que son producto de su voluntad o que pudo prever e impedir.(166) *312 De acuerdo con esta premisa, sólo se puede castigar a quien actúa culposamente.(167)
El Código Penal dispone también que los delitos se consideran cometidos con intención:
(a) Cuando el hecho correspondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo;
(b) el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor, o
(c) cuando el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado.(168)
Este elemento subjetivo, según señala el profesor Chiesa Aponte, está subdividido, a su vez, “en tres modalidades: propósito, conocimiento, y temeridad”.(169) En la modalidad de intención por conocimiento, también denominada “dolo directo de segundo grado”, el sujeto no tiene como propósito la producción del hecho delictivo, pero sabe que es prácticamente seguro que su actuación dará lugar a un resultado lesivo.(170) En fin, actúa con conocimiento la persona que “haya previsto que existía una alta probabilidad de que se realizara la conducta prohibida”. (Enfasis suprimido.)(171)
Los estudiosos del Derecho Penal coinciden en que “la única participación punible es la participación dolosa en el hecho doloso del autor”. (Énfasis suprimido.)(172) En el caso del cooperador, hay que precisar la fuente de conocimiento que imparte a su participación la cualidad de *313 dolosa. El Artículo 23(b) del Código Penal de 2004, supra, nos permite concluir que el conocimiento del cooperador emana de las circunstancias en las cuales se suscita el hecho punible. Es decir, el conocimiento de las circunstancias que tiene el cooperador es lo que define que el hecho punible sea una consecuencia natural de su conducta.(173)
Este conocimiento de las circunstancias del hecho puede obtenerse a base de un enfoque exclusivamente descriptivo o por la combinación de éste con la orientación normativa.(174) El primero permite conocer las circunstancias del hecho exclusivamente por los sentidos, mientras que el segundo necesita, además de la percepción de los sentidos, una captación intelectual de las circunstancias del hecho.(175) En concreto, el conocimiento de las circunstancias del hecho es lo que le provee al sujeto la conciencia de que su obrar no sólo es reprobable moralmente, sino que es contrario a la norma jurídica.(176)
En el caso particular de los delitos impropios de omisión dolosos, “el dolo requiere conocimiento de la situación generadora del deber de actuar (lo que aquí significa básicamente conocimiento de la amenaza de producción del resultado), conocimiento de las circunstancias que fundamentan la posición de garante y de las que fundamentan la posibilidad de actuar”.(177) Además, el dolo comprenderá no tan sólo la omisión de la acción necesaria, sino también la posibilidad y conveniencia de impedir el delito a través de la acción omitida.(178)
*314 En España, la contribución dolosa del cómplice (cooperador, en Puerto Rico) al hecho delictivo, según el Artículo 29 del Código Penal de España, sólo puede efectuarse en los actos anteriores o simultáneos a la comisión del delito.(179) Los actos posteriores a la consumación del delito no pueden constituir complicidad (cooperación), sino encubrimiento.(180)
Nuestro Código Penal de 2004 no establece el momento cuando debe materializarse la contribución del cooperador, contrario a la aportación que el coautor le brinda al delito, que según el Artículo 43(d), supra, puede realizarse en los actos anteriores, simultáneos y posteriores al hecho punible. Esta aplicación temporal de la coautoría podría extenderse a la forma de participación de la cooperación, bajo el supuesto de que el cooperador contribuye al delito, aunque no sea de forma contundente o definitiva. Sin embargo, esta contribución posterior no constituirá coautoría o, en su caso, cooperación, si la conducta posterior no aporta a la producción del delito. En ese caso no se puede hablar de coautoría o cooperación, sino del delito de encubrimiento. Sobre dicho delito, el Código Penal de 2004 dispone:
Toda persona que con conocimiento de la ejecución de un delito, oculte al responsable del mismo o procure la desaparición, alteración u ocultación de prueba para impedir la acción de la justicia, incurrirá en delito grave de cuarto grado.
Cuando el encubridor actúe con ánimo de lucro o se trate de un funcionario o empleado público y cometa el delito aprovechándose de su cargo o empleo, se le impondrá pena de delito grave de tercer grado.(181)
*315 D. Causa probable para arresto
La determinación de causa probable para arrestar o citar a una persona para que responda ante los tribunales por la comisión de un delito da inicio a la acción penal.(182) Al respecto, la Constitución del Estado Libre Asociado de Puerto Rico establece, en lo pertinente, que
[s]ólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.(183)
Se trata, pues, de una exigencia constitucional que impide que un imputado de delito sea sometido a un juicio sin una determinación judicial previa de causa probable para el arresto.(184)
Como el arresto es la forma que tiene el Estado para adquirir jurisdicción sobre una persona, el legislador estructuró un procedimiento para determinar causa probable, de manera que el arresto sólo pudiera ser ordenado por autoridad judicial.(185) Para ese fin, las Reglas de Procedimiento Criminal disponen el procedimiento y establecen los factores que puede considerar un magistrado para determinar causa probable para arresto. Según interpretados por nuestra jurisprudencia, éstos son: la denuncia jurada, las declaraciones juradas que se incluyan con ésta o el examen bajo juramento del denunciante o sus testigos, así *316 como cualquier combinación de estos factores, e incluso, sin necesidad de una denuncia, cuando se presente bajo juramento el testimonio de algún testigo con conocimiento personal del hecho delictivo.(186)
A pesar de todas estas consideraciones, lo determinante para establecer causa probable para arresto es que se provean al magistrado, bajo juramento o afirmación, todos los elementos necesarios para que éste pueda inferir la probabilidad de que se cometió determinado delito por la persona contra la cual se determina causa probable.(187) En otras palabras, sólo se tiene que establecer la existencia de una “relación causal fáctica tendiente a demostrar que una persona incurrió en una conducta punible mediante prueba de los elementos objetivos del delito y de su participación en el mismo”.(188) No es necesario que se establezca la existencia absoluta de responsabilidad.(189)
Como es patente, la vista de causa probable para arresto reglamenta los procedimientos preliminares al juicio y tiene por finalidad una determinación de causa probable.(190) Además, ésta no establece la culpabilidad o inocencia del acusado porque no conlleva una adjudicación final del caso.(191)
hH I—I !—1
El señor Sustache Sustache recurrió de una determinación del Tribunal de Apelaciones, en la cual se determinó *317 que existía causa probable para arrestarlo por los delitos de asesinato en primer grado y agresión en la modalidad de cooperador, por su omisión impropia de no evitar la muerte del señor Cáceres Cruz, y por el delito de encubrimiento en el grado de autor.
En esencia, el agente Sustache Sustache plantea que estos delitos no podían configurarse porque no existía prueba de su conocimiento respecto a que el agente Pagán Cruz iba a sacar su arma para dispararle al señor Cáceres Cruz. Argumenta, además, que la prueba no estableció los elementos requeridos para que aplicara la figura jurídica de la comisión por omisión. Finalmente, el peticionario ex-pone que el tribunal apelativo no tenía la facultad de determinar causa probable por el delito de encubrimiento, puesto que el Ministerio Público no le había imputado la comisión de este delito en la denuncia. Examinemos estas alegaciones a la luz del derecho previamente discutido.
Se ha establecido estatutariamente que un delito que tipifica la producción de un resultado, además de poderse realizar por acción, puede cometerse por omisión impropia. No obstante, para que esta nueva figura penal pueda activarse, deben estar presentes los factores siguientes: (1) la existencia de un deber de garante; (2) la producción del resultado; (3) la capacidad para actuar, y (4) la equivalencia entre la omisión y el resultado, que se determina a base de la existencia de un deber de garante y de la creación o aumento de un riesgo precedente.
El deber de garante de los agentes del orden público, respecto a los ciudadanos, es consustancial a su ministerio, según lo evidencia la ley orgánica del Departamento de la Policía y su reglamento de personal. De esta normativa, se puede apreciar que los policías tienen, entre otros, los deberes de observar y procurar la protección de los derechos civiles del ciudadano, proteger la vida y pres-tar la debida protección al pueblo reunido legalmente para cualquier fin lícito.
*318 La prueba del Ministerio Público fue suficiente para demostrar que, el 11 de agosto del 2007, el agente Sustache Sustache no cumplió con el deber de garante que tenía para con el señor Cáceres Cruz. Este deber se lo imponía la ley y era la razón de ser de su ronda policial. La prueba presentada ante la consideración del magistrado cumplió con los parámetros del procedimiento preliminar y, a esos fines, demostró una causa suficiente para concluir que el oficial Sustache Sustache se mantuvo observando y sin intervenir mientras: (1) el agente Pagán Cruz agredió con los puños, por primera vez, al señor Cáceres Cruz, quien retrocedía solicitando que no lo tocaran; (2) el oficial Pagán Cruz continuaba golpeando insistentemente al señor Cáceres Cruz, hasta el punto de golpearlo cuando éste se encontraba en el suelo; (3) el señor Cáceres Cruz trataba de levantarse del suelo; (4) el policía Pagán Cruz forcejeaba con el señor Cáceres Cruz para evitar que éste se levantara del suelo; (5) se oyó una primera detonación proveniente del arma de fuego del oficial Pagán Cruz, quién resultó herido en el muslo de su pierna izquierda, mientras el señor Cáceres Cruz quedó tendido en el suelo aturdido por la detonación; (6) el policía Pagán Cruz “chamboneó” para cargar su pistola, le apuntó al señor Cáceres Cruz y le disparó en varias ocasiones, mientras éste permanecía postrado en el suelo; (7) el oficial Pagán Cruz buscó la cabeza del señor Cáceres Cruz, quien había caído hacia el lado derecho, y le propinó otro disparo en esa parte del cuerpo.(192)
La omisión del oficial Sustache Sustache de cumplir con su deber de garante surge del testimonio del señor Toyens Quiñones, quien manifestó lo siguiente:
F: ¿Cómo usted sabe que estaba tratando de levantarse?
T: Porque se sujetó del muslo para pararse y ahí fue que siguió dándole. Entonces fue cuando el señor Tino Cruz se metió *319 para decirle “no le dé, no le dé”. Y yo me voy acercando más para sacar al señor Tino del medio. Cosa que la policía no fuera a intervenir, ponerle obstrucción a la justicia, volví a sacar a Don Tino, cuando se metió el otro policía entre Tino y el Agente Pagán. Y sacó a Tino para ....(193)
La única acción del agente Sustache Sustache registrada por los testigos no fue la de evitar que el policía Pagán Cruz continuara agrediendo físicamente al señor Cáceres Cruz, sino la de impedir que otros civiles le ayudaran. Esto a pesar de que el agente Sustache Sustache se encontraba cerca de donde el agente Pagán Cruz le estaba propinando la golpiza al señor Cáceres Cruz. Más aún, en lugar de intervenir para proteger la vida del señor Cáceres Cruz, la prueba recibida indica que el agente Sustache Sustache salió corriendo hacia la patrulla cuando se escuchó la primera detonación. Sobre este particular, también declaró el señor Toyens Quiñones:
T: Que ahí sonó el disparo y él embaló a correr.
E ¿Y usted que hizo?
T. Me empujó a mí, pues yo me quedé parado, porque no pude
E ¿Quién lo empujó a usted?
T. El guardia. Me cogió por la cintura y entonces corrió. Y yo pues me retiré un poquito más hacia atrás, como de 10 a 12 pies más, me retiré hacia atrás. Y ahí entonces ....(194)
Según los testimonios, el oficial Sustache Sustache no actuó para proteger la vida y los derechos civiles del señor Cáceres Cruz. Es decir, la prueba recibida demostró, para propósitos del proceso preliminar, que el señor Sustache Sustache no cumplió con su deber de garante y que su intervención a tiempo pudiera haber evitado la trágica muerte del señor Cáceres Cruz. Además, el agente tenía la capacidad para actuar, no sólo en términos físicos, sino también en el plano intelectual. En otras palabras, el poli *320 cía tenía las habilidades, el conocimiento de la situación y la posibilidad de reconocer la vía y los medios para realizar la acción mandada y salvar al bien jurídico amenazado.
Sin embargo, según la prueba recibida, en vez de intervenir para ayudar al señor Cáceres Cruz, el agente Sustache Sustache auxilió a su compañero Pagán Cruz. La prueba reflejó que el agente Sustache Sustache y la oficial Díaz De León, montaron a su compañero Pagán Cruz en la patrulla y que, al dirigirse al Hospital Ryder, le pasaron por el lado al cuerpo del señor Cáceres Cruz, quien yacía tirado en el suelo.(195) En fin, estos oficiales no verificaron siquiera si el señor Cáceres Cruz estaba vivo.
En ningún momento el agente Sustache Sustache se comunicó con algún superior para indicarle que había un civil herido, de manera que otros agentes lo socorrieran. Tampoco solicitó una ambulancia para el señor Cáceres Cruz. Esto a pesar de que el señor Cáceres Cruz se mantenía con vida.(196)
El Ministerio Público demostró, además, que los propios oficiales crearon la situación de riesgo en la que se encontraba el señor Cáceres Cruz al intentar arrestarlo, en las circunstancias descritas en los testimonios, un sábado en la tarde y en una actividad comunitaria de un quinceañero, mientras éste estaba dirigiendo el tráfico para facilitar el flujo vehicular.(197) Según vimos —y afirman los tratadistas— la situación de riesgo puede ser el resultado de una acción u omisión lícita o ilícita. Además, al omitir intervenir cuando el agente Pagán Cruz golpeaba excesivamente a un civil que se encontraba en el suelo y desarmado, los oficiales aumentaron el riesgo de que esa agresión inicial desatara una serie de eventos que culminaran en la muerte del señor Cáceres Cruz.
*321 Por otra parte, es cierto que los requisitos que conforman el delito de comisión por omisión están principalmente dirigidos a permitir que se impute la autoría de un delito a la persona que actúe por omisión. Sin embargo, los estudiosos de la materia de Derecho Penal han establecido que los delitos de comisión por omisión también pueden ejecutarse bajo la forma de participación denominada “cooperación”, siempre que una persona en posición de garante, teniendo la capacidad y oportunidad para hacerlo, no realice una acción que previsiblemente hubiera podido retrasar, aminorar o impedir la comisión del delito por el autor.
Ante esta situación, es necesario distinguir el conocimiento del delito que tiene un coautor del que tiene un cooperador. El conocimiento del delito que tiene el coautor es producto de su concierto y común acuerdo para ejecutarlo. Esto debido a que el coautor participa en la elaboración del plan desde sus actos preparatorios, simultáneos y hasta los posteriores a la comisión del delito, siempre que éstos sean concertados desde el principio del acuerdo. A los cooperadores no se les requiere este grado de conocimiento. Estos no tienen un conocimiento pleno del delito, porque el cooperador no participa directamente en la planificación o ejecución del delito, razón por la cual su contribución a la ejecución del delito no es indispensable.
Es cierto que la conducta de un cooperador debe ser intencional. No obstante, ello no es sinónimo de tener un conocimiento perfecto del crimen. Lo único que se requiere para configurar la intención delictiva en la modalidad de cooperación, es que el cooperador conozca las circunstancias del hecho, de tal manera que el resultado criminal pueda serle imputado como una consecuencia natural de su conducta. En los delitos de omisión impropia se requiere que el cooperador tenga, además, conocimiento sobre la situación generadora del deber de actuar, lo cual implica un conocimiento real de la amenaza o situación de *322 peligro del bien jurídico, conocimiento de las circunstancias que fundamentan la posición de garante y de las circunstancias que fundamentan la posibilidad de actuar. Afirmar lo contrario sería convertir al cooperador en un coautor.
Para que el tribunal pudiera encontrar causa para el arresto del agente Sustache Sustache como cooperador en los delitos de agresión y asesinato en primer grado, lo único que se requería era que el Ministerio Público demostrara que éste conocía que una consecuencia natural de su omisión voluntaria podría ser la muerte del señor Cáceres Cruz y que, a pesar de este conocimiento, el agente Sustache Sustache no actuó.
La prueba recibida en la vista para el arresto del oficial Sustache Sustache es suficiente para estos propósitos, pues demostró que éste tenía el conocimiento que se requiere para que se configure el delito de comisión por omisión en la modalidad de cooperadores. El agente Sustache Sustache tuvo conocimiento de las circunstancias del hecho, es decir, era consciente de la golpiza que el agente Pagán Cruz le estaba propinando al señor Cáceres Cruz. También, conocía su deber de garante para proteger la vida y los derechos civiles de la ciudadanía. Finalmente, tenía conocimiento de su capacidad para actuar, ya fuera evitando el abuso contra el señor Cáceres Cruz o controlando al agente Pagán Cruz. No era necesario que el agente Sustache Sustache tuviera conocimiento del tipo de delito que iba a cometer el agente Pagán Cruz. Esta exigencia sería más apropiada para la forma de intervención de la coautoría.
Finalmente, se desfiló prueba tendente a demostrar que el agente Sustache Sustache hizo falsas afirmaciones sobre lo ocurrido al fiscal Perea Mercado.(198) El fiscal Perea Mer *323 cado testificó sobre la inconsistencia en las versiones del agente Sustache Sustache e indicó que se percató de esto cuando observó un video que había grabado un ciudadano sobre lo sucedido.(199)
Estos actos fueron realizados después de que se perfeccionó el delito. Por esta razón, el Tribunal de Apelaciones determinó que se efectuaron para encubrirlo. El señor Sustache Sustache aduce que como el Ministerio Público no imputó el delito de encubrimiento en la denuncia, el Tribunal de Apelaciones erró al determinar causa probable por ese delito.
La facultad de los tribunales para determinar causa por un delito no incluido y distinto al imputado se ejerce en la vista inicial de causa probable para arresto y en la vista en alzada. Como hemos establecido, esta facultad no la provee el recurso de certiorari, el cual se limita a revisar cuestiones esencialmente de derecho. Una actuación contraria a esto, no sólo desnaturalizaría la finalidad de este recurso, sino que colocaría a la defensa en un estado de indefensión. Es necesario recordar que el señor Sustache Sustache no tuvo la oportunidad de rebatir en una vista el delito no imputado de encubrimiento, por el cual el tribunal apelativo le encontró causa.
IV
Concluimos que la prueba presentada por el Ministerio Público cumplió con el estándar requerido para determinar causa probable para el arresto del señor Sustache Sustache. Es decir, el fiscal logró establecer, mediante el grado de prueba requerido en esta etapa preliminar, todos *324 los elementos necesarios para que se pueda inferir que se cometieron los delitos y que éstos fueron ejecutados por el agente Sustache Sustache.
Por los fundamentos antes expresados, se confirma la sentencia del Tribunal de Apelaciones en cuanto determinó causa para arresto contra el señor Sustache Sustache por el delito de asesinato en primer grado y el delito de agresión, ambos en la modalidad de cooperador. Se revoca la decisión del tribunal apelativo que determinó causa probable por el delito no imputado de encubrimiento. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos compatibles con este dictamen.

Se dictará sentencia de conformidad.

El Juez Presidente Señor Hernández Denton emitió una opinión de conformidad. La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión disidente.
Opinión de conformidad emitida por el
Juez Presidente Señor Hernández Denton.
Estamos esencialmente conformes con la opinión del Tribunal en el caso de epígrafe. No obstante, en atención a la complejidad de la controversia que resolvemos hoy y a las repercusiones que el presente caso tiene sobre nuestro ordenamiento jurídico penal, deseamos explicar de manera particular los fundamentos de nuestro voto.
En síntesis, la controversia que este Tribunal resolvió hoy gira en torno a si un policía que presencia cuando un ciudadano es agredido y herido de muerte por otro agente del orden público, violando así sus derechos civiles, comete algún delito por no intentar intervenir con tales actos o por no auxiliar posteriormente a la víctima. Tras analizar detenidamente el derecho aplicable a la luz de varios cambios *325 sustantivos que introdujo el Código Penal de 2004 y de los hechos particulares de este caso, creemos que en esta etapa preliminar existe causa para arrestar al agente Carlos Sustache Sustache por el delito de asesinato en primer grado y agresión en la modalidad de cooperador. Veamos.
I—i
El resultado de este caso es una consecuencia directa e inevitable de un cambio trascendental en la conceptualization normativa y filosófica de la autoría penal en nuestra jurisdicción. Este nuevo enfoque conceptual no responde a la apreciación propia ni a la prerrogativa jurisprudencial de este Tribunal, sino a la clara intención legislativa plasmada en el Código Penal del Estado Libre Asociado de Puerto Rico de 2004 (33 L.P.R.A. see. 4629 et seq.).
Desde principios del siglo XX, en Puerto Rico prevalecía una visión unitaria de la autoría y de la participación que provenía del modelo penal anglosajón. Es decir, se entendía que todas las personas que intervenían en la comisión de un delito para la producción de un resultado criminal eran coautores, independientemente del grado o de la intensidad de la participación de cada individuo en los hechos delictivos imputados. En conformidad con esta visión —conocida conceptualmente como la “teoría de la equivalencia”— se trataba al autor y al cooperador de igual manera y su responsabilidad penal era la misma. Véase L.E. Chiesa Aponte, Derecho Penal Sustantivo, Estados Unidos, Pubs. JTS, 2007, págs. 176-77 y 184-187.
Según el profesor Luis E. Chiesa Aponte, ésta fue la teoría imperante en nuestra jurisdicción sobre la autoría y la participación, hasta la aprobación reciente del Código Penal de 2004 y su adopción de la “teoría de diferenciación”, la cual proviene de los países de tradición civilista y contempla la imposición de castigos de mayor severidad al autor que al cooperador. Específicamente, el Art. 44 del *326 nuevo Código Penal establece que “ [s] e consideran cooperadores los que sin ser autores, con conocimiento, cooperan de cualquier otro modo en la comisión del delito”. (Enfasis suplido.) 33 L.P.R.A. sec. 4672. La diferenciación entre ambos grados de participación es evidente, pues a los cooperadores se les impone “una pena igual a la mitad de la pena señalada para el delito ... hasta un máximo de diez años”. Art. 45 del Código Penal de 2004 (33 L.P.R.A. sec. 4673).(1)
Por su parte, dicha diferenciación no tenía cabida en la definición de autoría del Código Penal de 1974, dado que ésta incluía de modo general en sus preceptos a “[l]os que cooperaren de cualquier ... modo en la comisión del delito”, situando a este participante en el mismo nivel que cualquier otro autor del delito. 33 L.P.R.A. sec. 3172(e). La amplitud del concepto de autoría según la visión unitaria del Código anterior condujo a este Tribunal a delimitar su alcance en varias instancias, por lo que se requería que la participación de los cooperadores, que eran a su vez auto-res, fuera consciente e intencional. Véanse: Pueblo v. Lucret Quiñones, 111 D.P.R. 716 (1981); Pueblo v. Santos Ortiz, 104 D.P.R. 115 (1975). Además, de acuerdo con dicho esquema normativo, era necesario probar que los autores actuaron en concierto y común acuerdo como parte de una conspiración y designio común, independientemente de la intensidad en la participación o del grado de autoría de cada individuo. Pueblo v. Pagán Ortiz, 130 D.P.R. 470 (1992); Pueblo v. Ortiz Martínez, 116 D.P.R. 139 (1985).
Así las cosas, el nuevo Código Penal abandonó ese enfo *327 que unitario de la autoría y adoptó una conceptualización más restrictiva de la figura del autor, que se contrapone a un enfoque decisivamente más amplio de la responsabilidad penal en nuestra jurisdicción. Ello como resultado de que la Asamblea Legislativa reconociera la figura del cooperador como categoría distinta e independiente de responsabilidad penal, estableciendo así consecuencias penales para cierta conducta que, bajo el estado de derecho anterior, podría haber quedado impune.
En otras palabras, la intención legislativa del nuevo Código Penal fue clara al disponer que el cooperador cuya participación es indispensable para la ejecución del delito es un coautor bajo el Art. 43 (33 L.P.R.A. see. 4671), mientras que un cooperador subsidiario bajo el Art. 44, supra, “no particip [a] directamente en la planificación o ejecución del delito, ni tien[e\ conocimiento pleno del mismo”. (Enfasis suplido.) Informe de la Comisión de lo Jurídico del Senado sobre el P. del S. 2302, 22 de junio de 2003, pág. 31. Al realizar tales cambios en la visión normativa del concepto de participación y autoría con el propósito de ampliar la responsabilidad penal en nuestra jurisdicción, el legislador se refirió específicamente a que dicha figura ya había sido reconocida de forma análoga en varias jurisdicciones de Europa, particularmente en España y Alemania. Véase Informe sobre el P. del S. 2302, supra; D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, Hato Rey, Inst, para el Desarrollo del Derecho, 2005, págs. 72-77.
I—i HH
En efecto, este Tribunal atiende la presente controversia bajo la óptica de los cambios noveles sobre el concepto de autoría que ocurrieron recientemente en nuestro ordenamiento jurídico. Sin embargo, la complejidad del presente caso se exacerba al tomar en cuenta que el Ministerio Público no le imputa al agente Sustache Sustache ser co *328 operador por sus acciones afirmativas dirigidas a un resultado particular. Por el contrario, su alegada responsabilidad penal recae en la posibilidad de que ciertas omisiones y su incumplimiento con el deber de garante que ostentaba como agente del orden público fixe un modo de cooperación con la comisión de los delitos de agresión y asesinato en primer grado imputados a nivel de autoría a un tercero, que era compañero de éste en la Policía.
En ese contexto, la opinión del Tribunal integra la discusión de la participación del cooperador con la comisión por omisión, otra figura novel importada a nuestro estado de derecho penal de las jurisdicciones continentales de tradición civilista, particularmente de los Códigos Penales de España y Alemania. D. Nevares-Muñiz, op. cit., págs. 28-29. El Art. 19 del nuevo Código Penal dispone que los delitos que tipifican la producción de un resultado “podrán cometerse por omisión cuando la no evitación del mismo equivalga a su producción activa”. 33 L.P.R.A. sec. 4647. A su vez, dicho artículo establece que “[p]ara determinar la equivalencia de la omisión a la acción se tendrá en cuenta la existencia de un deber específico de evitar el resultado y si una acción anterior del omitente hace posible imputarle la situación de riesgo en que se encontraba el bien jurídico lesionado”. (Énfasis suplido.) 33 L.P.R.A. sec. 4647.(2)
Ahora bien, en conformidad con la doctrina científica claramente expuesta en la opinión del Tribunal, no se exige que se pruebe una causalidad estrecha entre la omisión y la producción del resultado, “sino la causalidad potencial de una acción no llevada a cabo”. (Énfasis suplido.) E. Ba *329 cigalupo, Delitos Impropios de Omisión, 2da ed., Bogotá, Ed. Temis, 1983, pág. 90. Por lo tanto, al atender un caso en el que se impute la comisión por omisión en un delito de resultado, el tribunal debe dilucidar si la acción que el acusado omitió realizar hubiera potencialmente evitado la producción del resultado delictivo, y no si la omisión imputada es la causa de que se produjera el resultado.
Por otro lado, el profesor Chiesa Aponte explica que una omisión puede generar responsabilidad penal por delitos de resultado únicamente si concurren tres requisitos: (1) la existencia de un deber jurídico de realizar la acción, (2) la capacidad para realizar la acción, y (3) la no realización de la acción mandada. Chiesa Aponte, op. cit., págs. 89-100. De tales requisitos se deduce otro cambio radical en la filosofía del nuevo Código Penal, pues el deber jurídico que no realiza el omitente “no necesariamente tiene que ser impuesto por la ley positiva, ya que puede surgir de principios que, aunque no han sido estatuidos por el legislador, permean todo el ordenamiento jurídico”. íd., pág. 89.(3)
Sin embargo, para que la omisión en controversia acarree responsabilidad penal, debe existir una relación “lo suficientemente estrecha entre el actor y la víctima que justifique la imposición de dicha obligación”. Chiesa Aponte, op. cit., pág. 93. En el derecho penal de los países de tradición civilista se hace referencia a que el omitente debe estar en una “ ‘posición de garante’ ” frente a la víctima. Id. Véase, además, G. Jakobs, Derecho Penal: parte general, fundamentos y teoría de la imputación, (J. Cuello Contreras y J.L. Serrano González de Murillo, trads.), 2da ed., Madrid, Marcial Pons Ediciones Jurídicas, 1997, pág. 933.
La existencia del deber de garante que se requiere para la imputación de responsabilidad penal por omisión en de *330 litos de resultado puede surgir de múltiples instancias y relaciones interpersonales. Por ejemplo, esta responsabilidad de actuar puede desprenderse de las relaciones de parentesco o afinidad, de una relación contractual, de acciones recíprocas de confianza, de un peligro precedente, de ser el dueño de una propiedad, de la asunción voluntaria de confianza o de la propia ley. Véase Chiesa Aponte, op. cit., págs. 93-97.
El reconocimiento de un deber de garante es necesario, pero no suficiente, para que se configure un delito de resultado en la modalidad de comisión por omisión. En conformidad con el Art. 19 del Código Penal de 2004, supra, la conducta imputada será penalmente relevante si se prueba la equivalencia entre la omisión de la conducta requerida por la posición de garante en que se encontraba el acusado y el resultado delictivo que se le imputa a éste. En términos prácticos, dicha exigencia se satisface cuando “la omisión del comportamiento requerido es equivalente en términos de su reprochabilidad a la producción del resultado mediante una acción afirmativa”. (Enfasis en el original suprimido y énfasis suplido.) Chiesa Aponte, op. cit., pág. 98. En vista de ello, este requerimiento de equivalencia que impone la referida disposición sólo implica que debe existir una relación de causa próxima entre la omisión de realizar la acción requerida por el deber de garante y la producción del resultado delictivo. Id., pág. 99. Ello permitiría atribuir de manera razonable el resultado al omitente, con atención particular a su conducta anterior o simultánea a los hechos delictivos en controversia.
Por otra parte, hoy resolvimos que el Art. 19 del Código Penal, supra, no prohíbe que se imputen los diferentes grados de coautoría o cooperación en los delitos de omisión. Como bien reseña la opinión del Tribunal, esta conclusión tiene gran apoyo en la doctrina científica pertinente para la interpretación de los referidos articulados. Véanse: S. Mir Puig, Derecho Penal: Parte General, 7ma ed., Buenos *331 Aires, Ed. B de'F, 2005, págs. 395-396; M.C. López Peregrin, La Complicidad en el Delito, Valencia, Ed. Tirant lo Blanch, 1997, págs. 330-333; Bacigalupo, op. cit., pág. 269. Al adoptar la teoría de diferenciación en el concepto de autoría, la Asamblea Legislativa autorizó que se imputara a un participante pasivo de un delito la responsabilidad penal de un cooperador, siempre y cuando se cumplan con los requisitos aplicables a ambas figuras. Es decir, la comísión por omisión en el grado de cooperación es posible “siempre que exista posición de garante y quepa afirmar que la omisión contribuyó, en una causalidad hipotética, a facilitar o favorecer la causación del delito por el autor”. (Enfasis suplido.) F. Muñoz Conde, Derecho Penal, Parte General, 6ta ed., Valencia, 2004, pág. 449.
Como se puede apreciar, la normativa antes expuesta revela una clara intención del legislador de ampliar la responsabilidad penal en nuestro ordenamiento jurídico. Al contemplar la configuración de un delito de resultado como consecuencia de una omisión relacionada con el deber de actuar en ciertas relaciones de autoridad y otras relaciones interpersonales, la Asamblea Legislativa adoptó —aunque de manera limitada— la concepción colectivista de la responsabilidad personal que rige en la mayoría de los países de tradición civilista.
En nuestra jurisdicción no existe un deber general ni estatutario de auxiliar a extraños o terceros que se encuentran en peligro. Ello es corolario del derecho a la libertad que emana de la Constitución. Véase P.H. Robinson, Criminal Liability for Omissions: A Brief Summary and Critique of the Law in the United States, XXIX (Núm. 1) N.Y. L. School L. Rev. 101, 117 (1984). No obstante, sí existen varios deberes jurídicos de actuar afirmativamente en determinadas circunstancias, y la omisión de realizar el comportamiento requerido podría incidir —en conformidad con el Art. 19 del nuevo Código Penal, supra— en la responsabilidad penal de la persona que se encontraba en la posición de garante.
*332 III
A la luz de este nuevo enfoque filosófico del Código Penal en cuanto a la comisión por omisión y la figura de los cooperadores en nuestro ordenamiento jurídico penal, es evidente que como cuestión de derecho no se debe dejar sin efecto la orden de arresto emitida contra el agente Sustache Sustache en esta etapa preliminar de los procedimientos. Se deduce del expediente que en la vista celebrada contra el imputado se presentó la scintilla de evidencia requerida para probar que éste pudo haber cooperado en la comisión del asesinato en primer grado del Sr. Miguel Cáceres, precisamente por no haber cumplido con el deber jurídico que le impone la ley, los reglamentos y los principios que rigen a la Policía de Puerto Rico en una situación de riesgo y alta peligrosidad.
En efecto, el agente Sustache Sustache tenía un deber de garante frente a la víctima, pues su oficio le impone la obligación de proteger los derechos civiles y la vida de los ciudadanos, así como la de prestar la debida protección al pueblo reunido legalmente para cualquier fin lícito. Véanse: Art. 3 de la Ley de la Policía de Puerto Rico de 1996 (25 L.P.R.A. see. 3102); Reglamento de Personal de la Policía de Puerto Rico, Reglamento Núm. 4216 de 11 de mayo de 1990. Para los propósitos de una posible configuración del delito imputado en la modalidad de comisión por omisión, la prueba presentada ante el Tribunal de Primera Instancia apunta a que el deber jurídico que le imponía al agente Sustache Sustache la obligación de actuar afirmativamente se activó en este caso una vez el agente Javier Pagán comenzó a agredir al señor Cáceres mientras realizaba una intervención para arrestarlo sin causa aparente, con la anuencia y participación previa del agente Sustache Sustache.(4)
*333 Al estar obligado a proteger los derechos civiles de los ciudadanos en conformidad con los preceptos mencionados, éste tenía el deber de intervenir con el agente Pagán para impedir y evitar el uso de la fuerza excesiva que finalmente resultó en la muerte del señor Cáceres. Esta agresión ocurrió frente al agente Sustache Sustache, quien supuestamente observó los sucesos y decidió deliberadamente no intervenir para detener a su compañero, aun cuando era evidente que se estaban violando los derechos civiles de un ciudadano.
Además, la prueba sugiere que el agente Sustache Sustache impidió afirmativamente que otras personas intervinieran para detener el uso de fuerza excesiva en que incurrió el agente Pagán, lo que podría intensificar su participación en los hechos en controversia. Asimismo, la prueba apunta a que el agente Sustache Sustache deliberadamente omitió asistir al señor Cáceres luego de que éste fue agredido y herido de gravedad con varios disparos por su compañero. A su vez, se alegó que los tres policías en la escena se marcharon del lugar y no informaron de forma alguna a sus superiores de que un ciudadano se encontraba herido en el lugar de los hechos, a pesar de que los eventos ocurrieron con su conocimiento y en su presencia inmediata. En su posición de garantes frente a la ciudadanía allí reunida, éstos tenían la responsabilidad evidente de auxiliar a la víctima, la cual la prueba presentada refleja que en aquel momento aún se mantenía con vida.
Así las cosas, la prueba desfilada hasta el momento tiende a indicar que la agresión y muerte del señor Cáceres configuró un delito de resultado cuya comisión aparentemente fue auxiliada por el incumplimiento del peticionario con el deber jurídico que emana de los estatutos y de los principios de la Policía. Es decir, la no evitación del resultado del asesinato del señor Cáceres en el presente caso *334 pudo equivaler al grado de reprochabilidad de su producción activa, pues la acción requerida por el ordenamiento que el imputado omitió realizar pudiera haber evitado potencialmente la producción del resultado delictivo.
En vista de que la participación y cooperación del agente Sustache Sustache en cuanto a la comisión del asesinato en primer grado no fue necesariamente indispensable, se le denuncia por dicho delito en el grado de cooperador al amparo del Art. 44 del Código Penal de 2004, supra. Según se desprende diáfanamente de la normativa ex-puesta en la opinión del Tribunal, esta modalidad de participación se puede configurar si el imputado coopera de cualquier modo con la comisión del delito principal realizado por un tercero, independientemente de que la intervención no haya sido directa ni con pleno conocimiento.
Aunque el Art. 44 del Código Penal de 2004, supra, requiere que el cooperador actúe con conocimiento, el propio historial legislativo y la doctrina científica aplicable que reseña la opinión del Tribunal revela que dicha exigencia se satisface con el conocimiento de que se ha generado la amenaza de producción de un resultado delictivo. Según explica Mir Puig, ello se trata del conocimiento “del carácter delictivo, sin el cual la participación se estima impune”. (Enfasis suplido y citas omitidas.) Mir Puig, op. cit, pág. 412. Así pues, cuando se imputa la cooperación en la modalidad de comisión por omisión, es suficiente con que concurra el conocimiento de la existencia de una posición de garante que impone un deber jurídico y la posibilidad táctica de actuar afirmativamente en unas circunstancias particulares de riesgo.
A la luz de la prueba desfilada ante el Tribunal de Primera Instancia, se puede colegir que existe causa probable para imputarle al agente Sustache Sustache una situación de riesgo que fomentó la producción de un resultado delictivo al incumplir con su deber de garante de manera injustificada. Claramente, dicha amenaza fue creada por *335 las acciones previas de los agentes desde el inicio de la intervención y se intensificó a un grado penalmente relevante con la eventual golpiza del señor Cáceres. De ser ciertos los hechos expuestos por el Ministerio Público, no hay duda de que la peligrosidad objetiva de la conducta del peticionario fue una omisión intencional, ya sea dolosa o temeraria, que resultó en una cooperación con la comisión del delito de asesinato en primer grado por el cual ya fue convicto el agente Pagán.(5)
Por lo tanto, no es necesario que en el procedimiento penal contra un cooperador de acuerdo con el Art. 44, supra, se demuestre que el imputado actuó con deliberación directa en cuanto a la comisión del asesinato en primer grado. Basta con que el Ministerio Público pruebe la conducta delictiva por parte del autor —en este caso el agente Pagán— para luego probar más allá de duda razonable que el imputado intencionalmente cooperó de cualquier modo con la comisión del asesinato en primer grado que realizó ese tercero, en conformidad con la normativa expuesta por este Tribunal.
En este caso, era objetivamente previsible que la golpiza y el uso de fuerza excesiva por parte del agente Pagán pudieran resultar en la muerte eventual del señor Cáceres. Claro está, para probar finalmente la intención del impu *336 tado y lograr una convicción, el Ministerio Público tendrá que probar más allá de duda razonable que el agente Sustache Sustache, como cuestión de hecho, había previsto subjetivamente la posibilidad de que mediante su conducta cooperadora se produjera la situación de riesgo que generó el hecho delictivo. Véase Chiesa Aponte, op. cit., pág. 155. Sin duda alguna, no nos corresponde pasar juicio sobre ese elemento subjetivo de hecho bajo ese estándar de prueba en esta etapa de los procedimientos.
Por todo lo anterior, estamos totalmente conformes con la opinión del Tribunal en cuanto a la determinación de causa probable para arresto contra el agente Sustache Sustache por asesinato en primer grado y agresión en la modalidad de cooperador.

 Además, expuso como error que el foro apelativo utilizó en sus determinaciones de hechos la transcripción de la vista para acusar a la oficial Díaz De León y que aplicó preceptos españoles al derecho constitucional y penal puertorriqueños, y que creó figuras y responsabilidades jurídicas que son extrañas a la normativa penal y a la Carta de Derechos de este país. Respecto a lo primero, constatamos que el Tribunal de Apelaciones utilizó, como resumen de la prueba testifical en el caso del señor Sustache Sustache, la Moción de Reconsideración a la Determinación de No Causa para Arresto en Alzada, que el Ministerio Público presentó ante el Tribunal de Primera Instancia. Este recuento fáctico no fue objetado por el señor Sustache Sustache. Tampoco el juez de instancia cuestionó la sinopsis de los testimonios incluidos en dicha moción. La transcripción privada que el Ministerio Fiscal sometió ante el tribunal apelativo sólo fue utilizada por este foro judicial como resumen de la prueba testifical en el caso de la agente Díaz De León.
En cuanto al uso de fuentes españolas, es importante señalar que el Código Penal de 2004 adoptó un nuevo enfoque teórico para distinguir las formas de autoría y participación en el delito, sustituyendo la teoría de la equivalencia —de influencia anglosajona— por la teoría de la diferenciación, que característica de las jurisdicciones de Derecho Civil. Por eso la necesidad de nutrir el análisis jurídico penal con el derecho comparado, a partir de la aprobación del Código Penal de 2004.

 Regla 6(c), 23(c) y 24(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

 Pueblo v. Torres, Esparra, 132 D.P.R. 77, 85-86 (1992).

 Reglas 24(c) y 6(c) de Procedimiento Criminal, supra; Pueblo en interés menor K.J.S.R., 172 D.P.R. 490 (2007); Pueblo v. North Caribbean, 162 D.P.R. 374, 383 (2004); Pueblo v. García Saldaña, 151 D.P.R. 783, 789 (2000); Pueblo v. Colón Mendoza, 149 D.P.R. 630, 636 (1999); Pueblo v. Miró González, 133 D.P.R. 813, 816 esc. 3 (1993); Álvarez v. Tribunal Superior, 102 D.P.R. 236, 237 (1974).

 Pueblo en interés menor K.J.S.R., supra; Pueblo v. North Caribbean, supra, pág. 385; Pueblo v. Ríos Alonso, 149 D.P.R. 761, 769 (1999); Pueblo v. Martínez Rivera, 144 D.P.R. 631, 646 (1997); Pueblo v. Rivera Rivera, 141 D.P.R. 121, 134 (1996); Pueblo v. Méndez Pérez, 120 D.P.R. 137, 142 (1987); Pueblo v. Cruz Justiniano, 116 D.P.R. 28, 30 (1984).

 Reglas 6(c) y 24(c) de Procedimiento Criminal, supra; Pueblo en interés menor K.J.S.R., supra; Pueblo v. North Caribbean, supra, págs. 385-386; Pueblo v. García Saldaña, supra, pág. 790; Pueblo v. Ríos Alonso, supra, pág. 769; Pueblo v. Rivera Rivera, supra, pág. 135; E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1993, Vol. III, pág. 101.

 Pueblo v. Rivera Rivera, supra, págs. 134 y 135; Pueblo v. Cabrera González, 130 D.P.R. 998, 1002 (1992); Chiesa Aponte, op. cit., págs. 52-53 y 100-101.

 Pueblo v. Colón Mendoza, supra, pág. 636; Pueblo v. Rodríguez Ríos, 136 D.P.R. 685, 692 (1994); Pueblo v. Tribunal Superior, 95 D.P.R. 412, 414 (1967).

 Pueblo en interés menor K.J.S.R., supra; Pueblo v. Aponte, 167 D.P.R. 578 (2006).

 Pueblo en interés menor K.J.S.R., supra; Pueblo v. Aponte, supra; Pueblo v. Rodríguez Ríos, supra, pág. 692; Pueblo v. Colón Mendoza, supra, pág. 636.

 Pueblo v. Opio Opio, 104 D.P.R. 165, 171 (1975). Igualmente, hemos aclarado que esta opción judicial no está fundamentada en que el juez instructor de causa actúa como individuo y no como tribunal. Pueblo v. Tribunal Superior, supra, pág. 413.

 Pueblo v. Rivera Alicea, 150 D.P.R. 495 499 (2000); Pueblo v. Colón Mendoza, supra, pág. 636; Pueblo v. Cruz Justiniano, supra, pág. 30.

 Pueblo en interés menor K.J.S.R., supra.

 Pueblo en interés menor K.J.S.R., supra; Pueblo v. Aponte, supra; Pueblo v. Rivera Alicea, supra, págs. 499-500; Pueblo v. Colón Mendoza, supra, págs. 636-637; Pueblo v. Cruz Justiniano, supra, pág. 30. Lo anterior es consecuente con la finalidad del recurso de certiorari, que es un vehículo procesal extraordinario utilizado para que un tribunal de mayor jerarquía pueda corregir un error de derecho cometido por un tribunal inferior. Art. 670 del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. sec. 3491).

 Véase Moción de Reconsideración a la Determinación de No Causa para Arresto en Alzada de Fiscalía, 4 septiembre del 2007, Apéndice de la Petición de certiorari, pág. 149. El Ministerio Público obtuvo esta información de las notas que tomó durante la vista de causa probable en alzada celebrada el 28 de agosto de 2008.

 Véase la Resolución de 6 de septiembre de 2007, Apéndice de la Petición de certiorari, págs. 97 y 138.

 Art. 15 del Código Penal de 2004, Ley Núm. 149 de 18 de junio de 2004, según enmendada, 33 L.P.R.A. see. 4643.

 D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, 2da ed., Hato Rey, Inst, para el Desarrollo del Derecho, 2005, pág. 23.

 Nevares-Muñiz, op.cit., págs. 23-24. Sobre el particular, Chiesa Aponte ex-pone que “la inexistencia de uno de los eslabones del análisis impide pasar al siguiente nivel del esquema”. L.E. Chiesa Aponte, Derecho Penal Sustantivo, Estados Unidos, Pubs. JTS, 2007, pág. 13.

 f Muñoz Conde y M. García Arán, Derecho Penal: Parte General, 7ma ed., Valencia, Ed. Tirant Lo Blanch, 2007, pág. 209.

 Art. 18 del Código Penal de 2004 (33 L.P.R.A. sec. 4646).

 C. Blanco Lozano, Tratado de Derecho Penal Español, Barcelona, JM Bosch Editor, 2005, T. I, Vol. II, pág. 131; H. Heinrich Jescheck y T. Weigend, Tratado de derecho penal: parte general, (M. Olmedo Cardenete, trad.), 5ta ed., Granada, Ed. Comares, 2002, pág. 651.

 E. Novoa Monreal, Fundamentos de los delitos de omisión, Buenos Aires, Eds. Desalma, 1984, pág. 211; Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 91.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 91; Novoa Monreal, op. cit., pág. 211.

 Nevares-Muñiz, op. cit., pág. 27; Blanco Lozano, op. cit.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 103.

 Novoa Monreal, op. cit., pág. 211; R. Goldstein, Diccionario de Derecho Penal y Criminología, 3ra ed., Buenos Aires, Ed. Astrea, 1993, pág. 184.

 E. Cury Urzúa, Derecho Penal: Parte General, Santiago de Chile, Ed. Jurídica de Chile, 1985, T. II, pág. 304.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 103.

 S. Mir Puig, Derecho Penal: Parte General, 7ma ed., Buenos Aires, Ed. B de F, 2005, pág. 312.

 Heinrich Jescheck y Weigend, op. cit., pág. 652.

 E. Bacigalupo, Derecho Penal: Parte General, 2da ed., Buenos Aires, Ed. Hammurabi, 1999, págs. 550-553; H. Welzel, Derecho Penal Alemán, 4ta ed., Santiago de Chile, Ed. Jurídica de Chile, 1997, págs. 250-251; Mir Puig, op. cit., págs. 317-329; Muñoz Conde y García Arán, op. cit, págs. 243-248; M.C. López Peregrin, La Complicidad en el Delito, Valencia, Ed. Tirant Lo Blanch, 1997, págs. 337-352.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 93.

 Mir Puig, op. cit., pág. 318.

 Este tipo de manifestación de la posición de garante se hace palpable en la relación de protección de un padre hacia su hijo y, en general, en todas aquellas “que se derivan del derecho de familia, o de relaciones materialmente similares”. Como es notable, “[e]n esta forma de la posición de garante la vinculación con el bien jurídico proviene de la relación existente con el sujeto titular del bien jurídico”. (Enfasis suprimido.) E. Bacigalupo, Delitos Impropios de Omisión, 2da ed., Bogotá, Ed. Temis, 1983, págs. 143 y 144.

 Bacigalupo, Delitos Impropios de Omisión, op. cit., pág. 143; Bacigalupo, Derecho Penal: Parte General, op. cit., págs. 546-547. Para esta segunda forma de posición de garante “no es determinante la relación del omitente con el bien jurídico a través de su vinculación con su titular”, sino que ésta tiene “por contenido la dirección y el encauzamiento de algo que produce, por su utilización, peligro para bienes jurídicos en la vida social, por cuyo motivo un determinado sujeto o sujetos tienen como función el evitar y prevenir los daños”. Los ejemplos más comunes son: los bomberos, los policías y aquellos en los que la naturaleza y el efecto socialmente peligroso deriva de cosas materiales, como por ejemplo la tenencia de animales feroces. Bagacigalupo, Delitos Impropios de Omisión, op. cit., págs. 145-146.

 Muñoz Conde y García Arán, op. cit, pág. 244.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 91.

 M.J. Rodríguez Mesa, La atribución de responsabilidad en comisión por omisión, Navarra, Ed. Aranzadi, 2005, págs. 94-108; Heinrich Jescheck y Weigend, op. cit., pág. 669.

 Mir Puig, op. cit., pág. 318.

 Novoa Monreal, op. cit., pág. 143; Mir Puig, op. cit., pág. 323.

 Rodríguez Mesa, op. cit., págs. 99.

 Informe del Senado de Puerto Rico sobre el P. del S. 2302 de 22 de junio de 2003; Nevares-Muñiz, op. cit., pág. 28.

 Rodríguez Mesa, op. cit., pág. 97.

 Welzel, op. cit., pág. 253.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 94.

 Rodríguez Mesa, op. cit., pág. 95.

 Art. 3 de la Ley Núm. 53 de 10 de junio de 1996, según enmendada, 25 L.RR.A. see. 3102.

 Reglamento de Personal de la Policía de Puerto Rico, Reglamento Núm. 4216 de 11 de mayo de 1990, See. 5.2.

 Art. 28 del Código Penal de 2004 (33 L.P.R.A. see. 4656).

 Art. 2(1) de la Ley Núm. 32 de 22 de mayo de 1972, según enmendada, 1 L.P.R.A. see. 172(1).

 Art. 121 del Código Penal de 2004 (33 L.P.R.A. see. 4749); Báez Vega v. E.L.A., 87 D.P.R. 67, 74-76 (1963).

 Puig, op. cit., pág. 318.

 L.E. Chiesa Aponte, Los dogmas del nuevo Código Penal: ¿por qué enmendarlo y cómo hacerlo?, Vol. XL (Núm. 1) Rev. Jur. U.I.A. 139 (2005).

 Welzel, op. cit., pág. 251.

 Novoa Monreal, op. cit., pág. 137.

 íd.

 Welzel, op. cit., pág. 250.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 89.

 Baeigalupo, Derecho Penal: Parte General, op. cit., pág. 550.

 Bacigalupo, Delitos Impropios de Omisión, op. cit., págs. 149-150.

 íd.

 Welzel, op. cit., págs. 250-251; Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 550.

 J.M. Silva Sánchez, El nuevo Código Penal: cinco cuestiones cundamentales, Barcelona, José María Bosh Editor, 1997, pág. 67.

 Rodríguez Mesa, op. cit., págs. 105-106. Somos conscientes que los diccionarios de la lengua española no recogen la palabra causación, sin embargo, muchos tratadistas penales utilizan este término, con una connotación similar a la “causalidad adecuada” en el derecho civil. En específico, es el favorecimiento o aportación causal que un partícipe presta al resultado delictivo que ejecuta el autor. López Peregrin, op. cit., págs. 145-162.

 Rodríguez Mesa, op. cit., pág. 113.

 Bacigalupo, Delitos Impropios de Omisión, op. cit., págs. 89-90; Mir Puig, op. cit., págs. 328-329; Muñoz Conde y García Arán, op. cit., pág. 244.

 Rodríguez Mesa, op. cit., pág. 113.

 Muñoz Conde y García Arán, op. cit., pág. 244; Welzel, op. cit., pág. 251.

 Bacigalupo, Delitos Impropios de Omisión, op. cit., pág. 150; Rodríguez Mesa, op. cit., pág. 114.

 Welzel, op. cit., pág. 251.

 Heinrich Jescheck y Weigend, op. cit., pág. 666.

 Mir Puig, op. cit., pág. 329.

 íd.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 99.

 Art. 19 del Código Penal de 2004 (33 L.P.R.A. see. 4647).

 Código Penal de España, Ley Núm. 10 de 23 de noviembre de 1995, Título I, Art. 11. Véase, además, Mir Puig, op. cit., págs. 314-315.

 E. Eiranova Encinas y otros, Código Penal alemán: StGB; Código Procesal Penal alemán: StPO, Madrid, Marcial Pons Ediciones Jurídicas y Sociales, 2000, pág. 26.

 Nevares-Muñiz, op. cit, pág. 28.

 íd.

 Informe sobre el P. del S. 2302, supra, pág. 22.

 Mir Puig, op. cit., pág. 319.

 Historial Legislativo del P. del S. 2302, Comunicado Vía Correo Electrónico entre la Profesora Dora Nevares Muñiz y el profesor Santiago Mir Puig, 21 de mayo de 2003.

 Art. 25 del Código Penal de 2004 (33 L.P.R.A. sec. 4653).

 Nevares-Muñiz, op. cit., pág. 40.

 Art. 13 del Código Penal de 2004 (33 L.P.R.A. sec. 4641).

 Art. 2 del Código Penal de 2004 (33 L.P.R.A. sec. 4630).

 El concepto cooperador que se incorporó al Código Penal del Estado Libre Asociado de Puerto Rico de 2004 es denominado de diversas formas en distintos países de tradición civilista. Por eso, en España, Chile y Colombia al cooperador se le llama “cómplice”, mientras que en Alemania el concepto se denomina “complicidad simple” o “cooperador”. Véanse: Mir Puig, op. cit.; Blanco Lozano, op. cit.; M. Garrido Montt, Etapas de ejecución del delito: autoría y participación, Santiago de Chile, Ed. Jurídica de Chile, 1984; Cury Urzúa, op. cit.; D. Nevares-Muñiz y A.L. Kregloh Várela, La participación: estudio comparativo de Códigos Penales, Comisión de lo Jurídico del Senado de Puerto Rico, mayo 2002, pág. 2; G. Jakobs, Derecho penal: parte general, fundamentos y teoría de la imputación, (J. Cuello Contreras y J.L. Serrano González de Murillo, trads.), 2da ed., Madrid, Marcial Pons Ediciones Jurídicas, 1997; Welzel, op. cit.; Heinrich Jescheck y Weigend, op. cit.

 López Peregrin, op. cit., págs. 29-57; Chiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 176-177 y 184; Garrido Montt, op. cit., págs. 217-221; Blanco Lozano, op. cit, págs. 456-458; Muñoz Conde y García Arán, op. cit., pág. 431; Heinrich Jescheck y Weigend, op. cit., pág. 694.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 177.

 López Peregrin, op. cit., pág. 30.

 íd., pág. 47.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 177 y 184.

 Jakobs, op. cit., pág. 719.

 Muñoz Conde y García Arán, op. cit., pág. 431; Blanco Lozano, op. cit., pág. 456; López Peregrin, op. cit., pág. 40.

 López Peregrin, op. cit., pág. 55.

 Muñoz Conde y García Arán, op. cit., pág. 431.

 íd.

 López Peregrin, op. cit., pág. 48.

 íd.

 íd.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 177.

 íd.

 gi Código Penal de España de 17 de julio de 1870, revisado por la Ley del 7 julio de 1876, se extendió a Puerto Rico por el decreto del 23 de mayo de 1879. Al ocurrir el cambio de soberanía, la Orden General Núm. 1 de 18 de octubre de 1898 dejó en efecto este código, que fue sustituido, dos años después, por el Código Penal de Puerto Rico, adoptado por la Ley de 1 de marzo de 1902. Este último código tuvo como base el Código Penal de California de 1873.
A causa de la Ley de 1 de marzo de 1902 se compilaron y prepararon para publicación los varios códigos adoptados en esa misma fecha. También, se transfirieron al Código Penal varias disposiciones que originalmente se incluyeron en el Código de Enjuiciamiento Criminal. El texto del Código Penal de 1902, con las enmiendas hasta 1911, se incluyó en la Compilación de Estatutos Revisados y Códigos de Puerto Rico. Entre 1912 y 1923, sólo once artículos del Código Penal fueron enmendados.
*298 En 1937 se publicó una edición bilingüe del Código Penal de 1902, según enmendado, cuyo articulado retuvo la misma numeración del Código Penal de 1902. Esta edición incluyó una tabla de disposiciones equivalentes entre Puerto Rico y California. Tenía también anotaciones de los casos de ambas jurisdicciones. D. Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, 5ta ed., San Juan, Ed. Inst, para el Desarrollo del Derecho, 2005, págs. 40-41.

 Nevares-Muñiz y Kregloh Varela, op. cit., pág. 2; Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., pág. 361.

 Pueblo v. Rodríguez Hernández, 91 D.P.R. 183, 196 (1964); Pueblo v. Santiago Batista, 88 D.P.R. 543, 546 (1963); Pueblo v. Montalvo Acevedo, 83 D.P.R. 727, 729-730 (1961).

 Nevares-Muñiz y Kregloh Varela, op. cit., pág. 3.

 Nevares-Muñiz y Kregloh Varela, op. cit.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 177.

 J.E. Granados Peña, Refexiones en torno a Derecho Penal de nuestro tiempo: a propósito de la reforma del Código Penal de Puerto Rico y el fenómeno de la armonización del Derecho Penal occidental: una tarea inconclusa, Bogotá, Facultad de Derecho de la Universidad de los Andes, 2006, pág. 78.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 184; Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, op. cit., págs. 72-73; Nevares-Muñiz y Kregloh Varela, op. cit., págs. 3-5; Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit, pág. 362.

 Art. 42 del Código Penal de 2004 (33 L.P.R.A. sec. 4670).

 Art. 45 del Código Penal de 2004 (33 L.P.R.A. sec. 4673); Chiesa Aponte, Derecho Penal Sustantivo, op. cit, pág. 177.

 Art. 43 del Código Penal de 2004 (33 L.P.R.A. sec. 4671).

Art. 44 del Código Penal de 2004 (33 L.P.R.A. sec. 4672).

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 184.

 Mir Puig, op. cit., págs. 363-396; Chiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 178-179; Jakobs, op. cit., págs. 717-792; Blanco Lozano, op. cit., págs. 466-472; Heinrich Jescheck y Weigend, op. cit., págs. 692-693; Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 489; Muñoz Conde y García Arán, op. cit., págs. 432-437.

 Art. 43(d) del Código Penal de 2004 (33 L.P.R.A. see. 4671).

 Pueblo v. Rodríguez Hernández, supra; Pueblo v. Santiago Batista, supra; Pueblo v. Montalvo Acevedo, supra; Nevares-Muñiz y Kregloh Várela, op. cit., pág. 2; Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., pág. 361.

 Nevares-Muñiz y Kregloh Varela, op. cit., pág. 2; Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., pág. 362; Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, op. cit., pág. 75.

 Pueblo v. Pagán, Ortiz, 130 D.P.R. 470, 478-479 (1992); Pueblo en interés menor F.S.C., 128 D.P.R. 931, 938-939 (1991); Pueblo v. Ortiz Martínez, 116 D.P.R. 139, 145 (1985); Pueblo v. Lebrón Morales, 115 D.P.R. 113, 116 (1984); Pueblo v. Agosto Castro, 102 D.P.R. 441, 444-445 (1974).

 En el caso particular de España, su Código Penal de 1995 explica el concepto de coautor de la manera siguiente:
*302 “Artículo 28. Son autores quienes realizan el hecho por sí solos, conjuntamente o por medio de otro del que se sirven como instrumento.
“También serán considerados autores:
“a) Los que inducen directamente a otro u otros a ejecutarlo.
“b) Los que cooperan a su ejecución con un acto sin el cual no se habría efectuado.” Código Penal de España, supra, Tit. II, Art. 28. Véase, además, G. Quintero Olivares, Comentarios al Nuevo Código Penal, 3ra ed., Navarra, Ed. Aranzadi, 2004, pág. 315.
Mientras, el Código Penal de Alemania describe el término jurídico “coautor” como:
“Sección 25: Autoría
“I. Incurrirá en pena como autor el que cometa el delito por sí mismo o a través de otro.
“II. Si cometen el delito varios partícipes, cada uno incurrirá en pena como coautor.” Código Penal de Alemania, 13 de noviembre de 1998, Tit. Ill, See. 25. Véase, además, iranova Encinas y otros, op. cit., pág. 28.

 Muñoz Conde y García Arán, op. cit., pág. 434; Welzel, op. cit., pág. 129; Mir Puig, op. cit., pág. 390; Blanco Lozano, op. cit., pág. 468.

 Qhiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 178-179; Muñoz Conde y García Arán, op. cit., pág. 435; Welzel, op. cit., pág. 129; Blanco Lozano, op. cit.; Rodríguez Mesa, op. cit., págs. 174-175.

 Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 501.

 íd., pág. 502.

 G. Quintero Olivares, op. cit., pág. 323.

 Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 530; Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 183.

 Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 503; Mir Puig, op. cit., pág. 411.

 Quintero Olivares, op. cit., pág. 324.

 Art. 43(d) del Código Penal de 2004, supra.

 Art. 44 del Código Penal de 2004, supra.

 Código Penal de España, op. cit., Tit. II, Art. 29; Quintero Olivares, op. cit, pág. 325.

 Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., págs. 363 y 373; Informe sobre el P. del S. 2302, supra, pág. 31.

 Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., pág. 373; Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 531; Heinrich Jescheck y Weigend, op. cit., pág. 744.

 Quintero Olivares, op. cit, pág. 326.

 Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., págs. 373-374.

 id; Heinrich Jescheck y Weigend, op. cit., pág. 744; Chiesa Aponte, Derecho Penal Sustantivo, op. cit, pág. 180.

 R. Goldstein, Diccionario de derecho penal y criminología, 3ra ed., Buenos Aires, Ed. Astrea, 1993, pág. 188.

 Quintero Olivares, op. cit, págs. 325-326; Blanco Lozano, op. cit., pág. 477.

 Mir Puig, op. cit., pág. 367.

 íd., pág. 411; Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 530. De acuerdo con el tratadista Welzel, “favorecer” significa prestar una colaboración causal para la comisión del hecho principal. Welzel, op. cit., pág. 143.

 Muñoz Conde y García Arán, op. cit, pág. 444; H. Heinrich Jescheck y T. Weigend, op.cit., pág. 747.

 Blanco Lozano, op. cit., pág. 477.

 López Peregrin, op. cit., págs. 345 y 346; Cury Urzúa, op. cit., pág. 304; Muñoz Conde, op. cit., págs. 444-445; Heinrich Jescheck y Weigend, op. cit., pág. 749; Rodríguez Mesa, op. cit., págs. 184 y 185.

 López Peregrin, op. cit., pág. 345.

 Estas teorías fueron elaboradas para analizar las formas de intervención que se incluyen en el Código Penal de España. Por eso, aluden a la distinción entre la forma de autoría denominada “cooperación necesaria” y el tipo de participación conocido como “complicidad”. Al revisar estas teorías debemos recordar que al referirse a la cooperación necesaria se estarán refiriendo al coautor que se incluye en el Artículo 43(d) del Código Penal de Puerto Rico, supra, y cuando aludan a la figura del cómplice o a la cooperación no necesaria, se estarán refiriendo al cooperador del Artículo 44 de nuestro Código, 33 L.P.R.A. see. 4672. Mir. Puig, op. cit., págs. 409-410; López Peregrin, op. cit., págs. 412-429; Chiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 183-184; E. Gimbernat Ordeig, Autor y cómplice en derecho penal, Madrid, Facultad de Derecho: Sección de Publicaciones e Intercambios, Universidad de Madrid, 1966, págs. 151-161.

 López Peregrin, op. cit., pág. 412.

 íd., pág. 414.

 Qhiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 183. Gimbernat Ordeig explica que para determinar la escasez o la abundancia de una cosa o servicio se deben realizar dos juicios principales. Cataloga el primero como un juicio general y provisional, fundamentado en la concepción de un hombre promedio. Mientras, el segundo, que sería el definitivo, tendrá en cuenta los factores especiales o particulares que concurren en la persona concreta que recibe la cosa o servicio. Ilustremos la aplicación de esta teoría así: Si A proporciona a B un veneno, cuya venta sólo está permitida con receta, esto será, en principio, una cooperación necesaria para el asesinato que B quiere cometer. Sin embargo, dejará de serlo si se demuestra que B era un farmacéutico que tenía en su tienda el veneno que necesitaba. Del mismo modo, la entrega de una pistola-que, en general, es un bien escaso-es sólo una conducta constitutiva de complicidad si el que la recibe tiene ya una pistola en su casa que funciona perfectamente. Gimbernat Ordeig, op. cit, págs. 155-156. Véase López Peregrin, op. cit, pág. 416.

 López Peregrin, op. cit., págs. 416-418.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 183; Garrido Montt, op. cit., págs. 239-240.

 López Peregrin, op. cit., pág. 420, citando a González Cussac/Mira Benavent en Baldo Lavilla y Rosal Blasco, La Inducción, 1994, pág. 228.

 Jvlir Puig, op. cit., pág. 372.

 Mir Puig, op. cit., pág. 372, citando a Maurach, Tratado II, pág. 343; E. Bacigalupo, Hacia el Nuevo Derecho Penal, Buenos Aires, Ed. Hammurabi, 2006, págs. 467-468; Heinrich Jescheck y Weigend, op. cit., pág. 701; Jakobs, op. cit, págs. 740-742.

 Bacigalupo, Derecho Penal: Parte General, op. cit, pág. 495.

 íd., págs. 495-496; López Peregrin, op. cit, pág. 422; Mir Puig, op. cit., pág. 372; Bacigalupo, Hacia el Nuevo Derecho Penal, op. cit., págs. 468-469; Jakobs, op. cit.

 López Peregrin, op. cit., pág. 424; Bacigalupo, Hacia el Nuevo Derecho Penal, op. cit., pág. 469.

 López Peregrin, op. cit., pág. 425; Bacigalupo, Hacia el Nuevo Derecho Penal, op. cit., pág. 469.

 López Peregrin, op. cit., pág. 425.

 Granados Peña, op. cit., pág. 80.

 33 L.P.R.A. sec. 4672.

 informe sobre el P. del S. 2302, supra, pág. 31.

 íd.

 Art 22 del Código Penal de 2004 (33 L.P.R.A. sec. 4650).

 Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, op. cit., pág. 31; Informe sobre el P. del S. 2302, supra, pág. 23. Véase Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., pág. 200.

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 141.

 Art. 23 del Código Penal de 2004 (33 L.P.R.A. sec. 4651).

 Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 162.

 Informe sobre el P. del S. 2302, supra, pág. 25; Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, op. cit., pág. 202. Véase Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, op. cit., pág. 35; Chiesa, Derecho Penal Sustantivo, op. cit., págs. 146 y 147; Muñoz Conde y García Arán, op. cit., pág. 270; Mir Puig, op. cit, pág. 265.

 Chiesa, Derecho Penal Sustantivo, op. cit., pág. 147.

 López Peregrin, op. cit., pág. 80.

 Art. 23(b) del Código Penal de 2004, supra.

 Welzel, op. cit., págs. 90-92.

íd., págs. 90-91.

 J. Córdoba Roda, El conocimiento de la antijuricidad en la teoría del delito, Barcelona, Ed. Bosch, 1962, págs. 98 y 99. Cabe recordar, según recalca Córdoba Roda, que esto no supone un conflicto con la norma general de que “ ‘[l]a ignorancia de las leyes no excusa su cumplimiento’ ”, en tanto en cuanto “son conceptos distintos los de ‘ignorancia de la [l]ey’ e ‘ignorancia de lo contrario al Derecho’ o ‘de lo prohibido’ ...”. íd., págs. 101 y 102.

 Bacigalupo, Derecho Penal: Parte General, op. cit., pág. 562.

 Mir Puig, op. cit., pág. 330.

 íd., pág. 411; Bacigalupo, Derecha Penal: Parte General, op. cit., pág. 503. Véase Heinrich Jescheck y Weigend, op. cit., pág. 745.

 Se ha reconocido que la cooperación puede producirse cuando se trate de actos posteriores al delito, que han sido previamente prometidos o convenidos, en estos casos, aunque el acto materialmente se produce luego del delito, su efecto se retrotrae al momento de la promesa. Mir Puig, op. cit., pág. 411.

 Art. 285 del Código Penal de 2004 (33 L.P.R.A. sec. 4913).

 D. Nevares-Muñiz, Sumario de derecho procesal penal puertorriqueño, 7ma ed. rev., San Juan, Ed. Inst, para el Desarrollo del Derecho, 2004, pág. 43; Pueblo v. Rivera Martell, 173 D.P.R. 601 (2008); Pueblo v. Irizarry, 160 D.P.R. 544, 555 (2003); Pueblo v. Jiménez Cruz, 145 D.P.R. 803, 809-810 (1998); Pueblo v. Miró González, supra, pág. 819.

 Art. 2, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 326. La Enmienda IV de la Constitución de Estados Unidos contiene una exigencia igual.

 Pueblo v. Rivera Martell, supra; Pueblo v. North Caribbean, supra, pág. 379; Pueblo v. Irizany, supra; Pueblo v. Jiménez Cruz, supra; Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, op. cit., págs. 23, 24 y 27.

 O.E. Resumil de Sanfilipo, Práctica jurídica de Puerto Rico: derecho procesal penal, Oxford, Equity Publishing Company, 1990, T. I, págs. 108-109.

 Regla 6(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II; Pueblo v. Irizarry, supra, págs. 561-562.

 Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, op. cit., pág. 29; Pueblo v. Martell, supra; Pueblo v. North Caribbean, supra, pág. 381; Pueblo v. Irizarry, supra, pág. 560; Pueblo v. Jiménez Cruz, supra, págs. 812-813.

 Resumil de Sanfilipo, op. cit., pág. 118.

 íd.

 Pueblo v. Irizarry, supra, pág. 794 esc. 6; Pueblo v. Jiménez Cruz, supra, pág. 812; Pueblo v. Rivera Rivera, supra, pág. 128.

 El Pueblo v. Pillot, 19 D.P.R. 264 (1913); Pueblo en interés menor G.R.S., 149 D.P.R. 1, 19 (1999).

 Véase Moción Solicitando Reconsideración a la Determinación de No Causa para Arresto en Alzada, 4 septiembre del 2007, Apéndice de la Petición de certiorari, pág. 145.

 íd.

 íd.

 Apéndice de la Petición de certiorari, págs. 145-146.

 íd., pág. 146.

 íd., pág. 145.

 gn específico, la prueba indicó que el señor Sustache Sustache le informó al fiscal que todo el incidente se había suscitado muy rápido; en todo momento le estuvo dando la espalda al agente Pagán Cruz porque había muchas personas; se encargó de *323 mantener alejados a los civiles, y sacó su gas pimienta, pero no se atrevió a utilizarlo contra las personas porque le hubiera hecho daño a su compañero Pagán Cruz. Apéndice de la Petición de certiorari, págs. 146-147.

 Algunas de estas inconsistencias fueron, según su testimonio, que el agente Sustache Sustache en ningún momento sacó el gas pimienta y que no había mucha gente en el lugar de los hechos. Apéndice de laPetición de certiorari, pág. 147.

 El Art. 43(d) del nuevo Código Penal también incluye en la definición de autor a “[l]os que cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo”. 33 L.P.R.A. sec. 4671(d). No obstante, al crear una nueva categoría con una pena más benigna para los que “cooperan de cualquier otro modo en la comisión del delito” —Art. 44 del Código Penal de 2004 (33 L.P.R.A. see. 4672)— mediante los Arts. 44 y 45 antes mencionados, el propio cuerpo normativo penal hace una distinción precisa entre el grado de responsabilidad punible que se le imputa a los cooperadores cuya participación fue necesaria y a los cooperadores cuya participación fue subsidiaria, accesoria y dispensable.

 Se deduce del historial legislativo que la redacción de este articulado la propuso el profesor Santiago Mir Puig, quien aclaró que “ ‘[e]l elemento determinante para equiparar la omisión a la acción es que el omitente haya creado o aumentado el riesgo del bien jurídico, cuya lesión no se evita, aunque haya sido en un momento anterior y de forma lícita’ ”. Informe de la Comisión de lo Jurídico del Senado sobre el P. del S. 2302, 22 de junio de 2003, pág. 23. Por lo tanto, el referido artículo regula las omisiones impropias, que conllevan la no evitación de que se produzca un resultado delictivo como consecuencia de la inactividad de la persona. D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, Hato Rey, Inst, para el Desarrollo del Derecho, 2005, págs. 28-29.

 Véase además, R. Dworkin, Taking Rights Seriously, Massachusetts, Harvard University Press, 1977, págs. 22-28, citado en L.E. Chiesa Aponte, Derecho Penal Sustantivo, Estados Unidos, Pubs. JTS, 2007, pág. 89.

 Nótese que en el presente recurso no se atiende la posible participación ni la responsabilidad penal de la agente Zulma Díaz De León por los hechos ante nuestra *333 consideración. Ésta presentó un recurso de certiorari que aún se encuentra pendiente de consideración ante este Tribunal (CC-2008-4).

 De otra parte, el hecho de que el asesinato en primer grado requiere un grado mayor de dolo no significa que la cooperación subsidiaria con la comisión de dicho delito deba cumplir con ese mismo rigor e intensidad de participación. Ello así, pues el Art. 44 del Código Penal de 2004, supra, contempla la cooperación con la comisión del delito de cualquier modo. De hecho, siempre se trata de una participación accesoria y no necesaria, pues de lo contrario se trataría de un coautor. Lo importante es que el comportamiento del cooperador haya sido intencional —ya sea con propósito, conocimiento o temeridad— y no meramente negligente. Asimismo, creemos que el conocimiento requerido por el artículo referente a los cooperadores no se limita ex-clusivamente al dolo directo de segundo grado provisto por el Art. 23(b) del Código Penal de 2004 (33 L.P.R.A. sec. 4651(b)), sino que se podría configurar incluso “cuando el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado”. Art. 23(c) del Código Penal de 2004 (33 L.P.R.A. sec. 4651(c)). En ese caso, sólo se requeriría que la persona tenga consciencia del riesgo creado y que el riesgo creado sea injustificado. Véanse: L.E. Chiesa Aponte, Derecho Penal Sustantivo, Estados Unidos, Pubs. JTS, 2007, pág. 147; Nevares-Muñiz, op. cit., págs. 34-36.